[S.F. No. 23311. Sept. 16, 1976.]

ALLAN BAKKE, Plaintiff, Cross-defendant and Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,
Defendant, Cross-complainant and Appellant.

## COUNSEL

Jacobs, Blanckenburg, May & Colvin, Reynold H. Colvin and Robert D. Links for Plaintiff, Cross-defendant and Appellant.

David Lehrer, Justin Finger, Joy Meyers, Edward Leavy, Arnold Forster and Robert J. Snyder and John Ligtenberg as Amici Curiae on behalf of Plaintiff, Cross-defendant and Appellant.

Donald L. Reidhaar, John F. Lundberg and Gary Morrison for Defendant, Cross-complainant and Appellant.

June E. Moroney, Kenneth L. Karst, Norman Dorsen, Vilma S. Martinez, Sanford Jay Rosen, Roberto S. Martinez, Drucilla S. Ramey, Jack H. Friedenthal, Paul A. Brest, Charles J. Meyers, John Denvir, Crosby, Heafey, Roach & May, Williams, Myers & Quiggle, Emma Coleman Jones, Robert L. Harris, Lennox Hinds, Charles R. Lawrence III and Nathaniel S. Colley as Amici Curiae on behalf of Defendant, Cross-complainant and Appellant.

## OPINION

**MOSK, J.**—In this case we confront a sensitive and complex issue: whether a special admission program which benefits disadvantaged minority students who apply for admission to the medical school of the University of California at Davis (hereinafter University) offends the constitutional rights of better qualified applicants denied admission because they are not identified with a minority. We conclude that the program, as administered by the University, violates the constitutional rights of nonminority applicants because it affords preference on the basis of race to persons who, by the University's own standards, are not as qualified for the study of medicine as nonminority applicants denied admission.

In 1973 and 1974, plaintiff Allan Bakke, a Caucasian, applied for admission to the University, which is supported by public funds. There were 2,644 applicants for the 1973 entering class and 3,737 for the 1974 class. Only 100 places are available each year, of which 16 are filled under the special admission program in dispute; applicants for the remaining 84 places are chosen by recourse to the normal admission process.[1]

Bakke, who did not apply for consideration under the special program, was denied admission in both years, and was not admitted to any other medical school. He filed a complaint against the University seeking mandatory, injunctive, and declaratory relief to compel the University to admit him,[2] alleging he was qualified for admission and the sole reason his application was rejected was that he was of the Caucasian race. The complaint also alleged that all students admitted under the special program were members of racial minorities, that the program applied separate, i.e., preferential, standards of admission as to them, and that the use of separate standards resulted in the acceptance of minority applicants who were less qualified for the study of medicine than Bakke and other nonminority applicants not selected. He claimed he had been the victim of invidious discrimination because of his race, in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution.

[1]The determination that 16 students would be admitted under the special program was made by a resolution of the faculty of the medical school. Whether that figure was randomly selected, or has some rationale, is not revealed by the evidence.

[2]He prayed for an alternative writ of mandate directing his admission, for an order compelling the University to show cause why it should not be enjoined from denying him admission, and for a declaration that he was entitled to admission.

The University filed a cross-complaint for declaratory relief, seeking a determination that the special admission program was valid. The cross-complaint averred that the University considers the minority status of an applicant as only one factor in selecting students for admission, and that the purposes of the special program were to promote diversity in the student body and the medical profession, and to expand medical education opportunities to persons from economically or educationally disadvantaged backgrounds. The cross-complaint did not allege that Bakke should be denied relief because of laches.

The trial court, after considering the pleadings, the deposition and declaration of Dr. George H. Lowrey, the associate dean of student affairs and chairman of the admissions committee, and the interrogatories submitted by the parties, found that the special admission program discriminated against Bakke because of his race and that he was entitled to have his application evaluated without regard to his race or the race of any other applicant. It found against the University on its cross-complaint for declaratory relief. However, the court determined that Bakke was not entitled to an order for admission to the University because, although he was qualified to be admitted in both years in which he applied, he would not have been selected even if there had been no special program for minorities. Thus the court denied Bakke's prayer for an injunction ordering his admission.

Both parties appeal from the ensuing judgment—Bakke from the portion of the judgment denying him admission, and the University from the determination that the special admission program is invalid and that Bakke is entitled to have his application considered without regard to his race or the race of any other applicant. Bakke renewed his application for admission subsequent to the judgment, but the University refused to evaluate his qualifications without regard to the special admission program. We transferred the cause directly here, prior to a decision by the Court of Appeal, because of the importance of the issues involved. (Cal. Const., art. VI, § 12; rule 20, Cal. Rules of Court.)

### The Admission Procedure

An applicant for admission to the University is required to take the Medical College Admission Test, which measures accomplishment in four distinct areas—verbal, quantitative, general information, and science —and his score on this test is included in the application. The

application also calls for a description of extracurricular and community activities, a history of the applicant's work experience, and his personal comments. In addition, the applicant is required to submit two letters of recommendation, usually one from a science teacher and one from a teacher in another discipline, and transcripts from schools previously attended.

In 1973, the application form inquired whether the applicant desired to be considered by a special committee which passed upon the applications of persons from economically and educationally disadvantaged backgrounds. The following year a revised form was adopted;[3] instead of the question relating to disadvantage, the applicant was asked whether he "describes" himself or herself as a "White/Caucasian" or a member of some other identifiable racial or ethnic group,[4] and whether he wished to be considered an applicant from a minority group.

Although for 1974 and the years thereafter no specific question regarding disadvantage was mentioned on the application form, the material distributed by the University referred to a special program to increase opportunities for medical study for students from disadvantaged backgrounds, and between 1971 and 1974 both white and minority applicants applied for the special program.[5]

[3]The change in the application form resulted when, in 1974, the University joined the American Medical College Application Service, which acts as a clearing house for applications to medical schools; it adopted the form prescribed by that organization.

[4]The application specifically listed "Black/Afro-American, American Indian, Mexican/American or Chicano, Oriental/Asian-American, Puerto Rican (Mainland), Puerto Rican (Commonwealth), Cuban." There was a space labelled "Other" for those who belonged to a minority not enumerated.

[5]The record is not clear as to how and to whom the material regarding the special admission program was distributed. The statement is headed "Program to Increase Opportunities in Medical Education for Disadvantaged Citizens," and reads in part,

"A special subcommittee of the Admissions Committee, comprised of faculty and medical students, evaluates applicants from economically and/or educationally disadvantaged backgrounds who request on the application form such an evaluation. Ethnic minorities are not categorically considered under the Task Force Program unless they are from disadvantaged backgrounds. Our goals are: 1) identification and recruitment of potential candidates for admission to medical school in the near future, and 2) stimulation of career interest in the health professions among junior high and high school students.

"After receiving all pertinent information, selected applicants will receive a letter inviting them to the School of Medicine in Davis for an interview. The interviews are conducted by at least one faculty member and one student member of the Task Force Subcommittee. Recommendations are then made to the full Admissions Committee. Task Force faculty are also members of the Admissions Committee. . . ."

The selection of students for admission is conducted by two separate committees. The regular admission committee consists of a volunteer group of 14 or 15 faculty members and an equal number of students, all selected by the dean of the medical school.[6] The special admission committee, which evaluates the applications of disadvantaged applicants only, consists of students who are all members of minority groups, and faculty of the medical school who are predominantly but not entirely minorities. Applications from those not classified as disadvantaged (including applications from minorities who do not qualify as disadvantaged) are screened through the regular admission process. The evaluation of the two groups is made independently, so that applicants considered by the special committee are rated only against one another and not against those considered in the regular admission process. All students admitted under the special program since its inception in 1969 have been members of minority groups.

### The Regular Admission Program

Initially, members of the regular committee determine whether the applicant reflects sufficient promise to warrant a personal interview. Applicants with a college grade point average below 2.5 on a scale of 4.0 are summarily rejected, but a higher average does not necessarily guarantee that an interview will be afforded. In 1973, with 2,644 persons applying for admission, 815 applicants were selected for interviews under the regular program, and 462 interviews were granted in 1974 out of 3,737 applicants.

The interview sessions were conducted by one faculty member of the committee in 1973, but in 1974 each applicant was interviewed additionally by a student member. The interviewer prepares a summary of the meeting, reviews the file of the applicant, including his grade point average and his score on the Medical College Admission Test, and, after evaluating the applicant's potential contribution to the medical profession, grades him on a scale of 0 to 100. The applicant's file, including a summary of the interview but without the numerical score given by the interviewer, is then reviewed by four other committee members, two of whom are students and two faculty, chosen at random. These four independently rate the applicant on the same scale. The scores are totalled; in 1973 the highest score an applicant could achieve was 500,

---

[6]In 1973 there were more faculty members than students on this committee, but their numbers were equal in 1974.

whereas in 1974—because two interviews were conducted rather than only one—the highest score was 600.

This combined numerical rating is based upon an assessment of the applicant derived from information in his application, his letters of recommendation, the interview summary, test scores and grade point average, as well as a consideration of his motivation, character, imagination, and the type and locale of the practice he anticipates entering in the future. For example, because there is a shortage of doctors in the northern part of the state, and Davis is located in the north, some preference is given to applicants from that area who plan to remain there to practice.[7] The combined numerical rating is used as a "benchmark" for selection, although exceptions to strict numerical ranking may be made in special circumstances. For example, the University makes an exception in the unusual case of an applicant whose combined rating was "quite high" but not sufficient for admission but who is married to an applicant previously accepted.

Some attrition in acceptances normally occurs each year, and applicants whose ratings approximate those admitted may be placed on an alternate list. The dean of admissions has the discretion to select for the list applicants whose ratings will bring special skills or balance to the entering class; therefore not all unaccepted applicants with high ratings are placed on the list, and those who are so placed are not necessarily listed in order of numerical rating. Two out of three applicants offered admission under the regular procedure ultimately enroll at the University.

### The Special Admission Program

The faculty chairman of the special admission committee initially screens the applications of those who seek to enter the University as disadvantaged students, to determine if they may properly be classified as disadvantaged.[8] Those who do not qualify as disadvantaged are

[7]Bakke does not challenge the preference accorded to applicants from the northern part of the state, nor does he claim that he would have been admitted but for that preference. Indeed, the record does not indicate that any applicant in 1973 or 1974 was granted a preference because he planned to practice in Northern California.

[8]The chairman determines whether an applicant is disadvantaged by examining his application for such clues as whether he has been granted a waiver of the application fee, which requires a means test, whether he had in the past participated in programs for the disadvantaged, whether he worked during school, and the occupational background and education of his parents.

referred to the regular admissions committee. If a candidate passes this initial scrutiny, his application is reviewed by the special committee for the purpose of determining whether he should be invited for a personal interview. In making this determination the special committee, unlike the regular committee, does not automatically disqualify an applicant who has a grade point average below 2.5.

The committee interviewed 71 out of 297 disadvantaged applicants in 1973 and 88 out of 628 in 1974. The interview is conducted by one faculty member and one student member of the special committee. The file is then reviewed by other members of the special committee, who rate the applicant.

The special committee prepares a written summary of the qualifications of the disadvantaged applicants whom it recommends for admission, and the regular committee makes the actual determination whether to accept the recommendation. In practice, the special committee's recommendations are generally followed. The process of recommendation by the special committee and acceptance by the general committee continues until 16 applicants have been admitted under the special program.

Bakke had a grade point average of 3.51, and his scores on the verbal, quantitative, science, and general information portions of the Medical College Admission Test (expressed in percentiles) were 96, 94, 97 and 72 respectively. His application warranted an interview in both years for which he applied. In 1973, his combined numerical rating was 468 out of a possible 500, and in 1974 it was 549 out of a possible 600. He was not placed on the alternate list in either year.

Some minority students who were admitted under the special program in 1973 and 1974 had grade point averages below 2.5, the minimum required for an interview for those who did not qualify under the special program; some were as low as 2.11 in 1973 and 2.21 in 1974. According to Dr. Lowrey, if an applicant scored lower than the 50th percentile in the science and verbal portions of the Medical College Admission Test, the committee "would look very hard at other things that would be positive" such as motivation, or some explanation for his low scores. The mean percentage scores on the test of the minority students admitted to the 1973 and 1974 entering classes under the special program were below the 50th percentile in all four areas tested. In addition, the combined

numerical ratings of some students admitted under the special program were 20 to 30 points below Bakke's rating.

Dr. Lowrey stated in his declaration and deposition that the special admission program was designed to afford preferential treatment to persons who are from disadvantaged backgrounds. He stated further that test scores and grades of minority applicants do not necessarily reflect their capabilities, because their low scores might be attributable to the fact that they were required to work during the school year or that they lacked the reinforcement and support which white middle-class students typically derive from their families, and without such a program, few minorities would qualify for admission to the University. A major purpose of the program, he asserted, was to promote diversity among the student body and the profession and to increase the number of doctors practicing in the minority community, where the need is great.

The trial court found that although the special admission program purports to be open to "educationally or economically disadvantaged" students, and although in 1973 and 1974 some applications for the program were received from members of the white race, only minority students had been admitted under the program since its inception, and members of the white race were barred from participation. The court concluded that the program constitutes invidious discrimination in favor of minority races and against Bakke and others whose applications were evaluated under the regular admission procedure, in violation of their rights under the Fourteenth Amendment to the United States Constitution. The University does not challenge the trial court's finding that applicants who are not members of a minority are barred from participation in the special admission program.

### The Appeal of the University

The validity of preferential admission to professional school for minorities was before the United States Supreme Court in *De Funis* v. *Odegaard,* which involved a program at the University of Washington law school. However, after granting certiorari (414 U.S. 1038 [38 L.Ed.2d 329, 94 S.Ct. 538]) the high court determined, over the dissent of four justices, that the case was moot, and vacated the judgment of the

Washington Supreme Court (416 U.S. 312 [40 L.Ed.2d 164, 94 S.Ct. 1704].)[9]

The question before us has generated extraordinary interest in academia, as well as a proliferation of debate among legal writers and commentators. (See, for a mere literary sampling, Redish, *Preferential Law School Admissions and the Equal Protection Clause: An Analysis of the Competing Arguments* (1974) 22 U.C.L.A.L.Rev. 343; *De Funis Symposium* (1975) 75 Colum.L.Rev. 483; Sandalow, *Racial Preferences: The Judicial Role* (1975) 42 U.Chi.L.Rev. 653; Symposium, *De Funis: The Road Not Taken* (1974) 60 Va.L.Rev. 917; Ely, *The Constitutionality of Reverse Racial Discrimination* (1974) 41 U.Chi.L.Rev. 723; O'Neil, *Preferential Admissions: Equalizing the Access of Minority Groups to Higher Education* (1971) 80 Yale L.J. 699; Graglia, *Special Admission of the "Culturally Deprived" to Law School* (1970) 119 U.Pa.L.Rev. 351; Ginger (edit.), De Funis versus Odegaard and the University of Washington (1974); Cohen, *The De Funis Case: Race and The Constitution,* (Feb. 8, 1975) The Nation 135; O'Neil, Discriminating Against Discrimination (1975).) No fewer than 26 amici curiae briefs were filed in the United States Supreme Court in *De Funis.* Indeed, Justice Brennan, dissenting in *De Funis* from the determination of mootness, remarked that "[F]ew constitutional questions in recent history have stirred as much debate . . . ." (416 U.S. at p. 350 [40 L.Ed.2d at p. 188].)

---

[9]The program involved in *De Funis* was in some respects similar to the one in the present case. There, as here, a white student who was denied admission claimed that the program violated his rights under the Fourteenth Amendment. The trial court ruled in his favor, but its judgment was reversed by the Washington Supreme Court, which found a compelling state interest in integration of the school and the profession. (*De Funis* v. *Odegaard* (1973) 82 Wn.2d 11 [507 P.2d 1169, 1182].)

The United States Supreme Court determined that the case was moot because De Funis had later been admitted to the law school, and was about to graduate. It vacated the Washington judgment and remanded the case for such proceedings as the Washington Supreme Court might deem appropriate. Justice Douglas wrote a separate dissenting opinion on the merits (416 U.S. 312, 320 [40 L.Ed.2d 164, 171]), and joined Justices White and Marshall in Justice Brennan's opinion that the case was not moot (*id.,* at p. 348 [40 L.Ed.2d at pp. 186-187]).

Upon remand, four justices of the Washington Supreme Court were of the opinion that the court's prior decision should be reinstated. However, this view failed to command a majority. Three other justices, without considering the merits, determined that dismissal of the complaint was mandatory because the United States Supreme Court had vacated the prior judgment. Two justices, who had dissented from the court's original decision upholding the validity of the preferential program, again dissented. Although they were of the view that the case should not be dismissed, they reiterated the opinions they had previously expressed that the preferences afforded to minority groups were unconstitutional. (*De Funis* v. *Odegaard* (1974) 84 Wn.2d 617 [529 P.2d 438, 445, 448].)

We note at the outset that a number of social scientists and anthropologists deem "race" to be an anachronistic concept; Ashley-Montagu has termed it mischievous and retardive. Many experts consider "ethnic" to be more accurate since it relates to characteristics of groups that may be, in different proportions, physical, national, cultural, linguistic, religious or ideological. Unfortunately lexicon is imprecise and until an improved taxonomy emerges we shall probably be compelled to discuss problems such as that before us in terms of race. (See, e.g., Allport, The Nature of Prejudice (1954) pp. xv-xvi.)

We also observe preliminarily that although it is clear that the special admission program classifies applicants by race, this fact alone does not render it unconstitutional. Classification by race has been upheld in a number of cases in which the purpose of the classification was to benefit rather than to disable minority groups.

Thus, such classifications have been approved to achieve integration in the public schools (*Swann* v. *Board of Education* (1971) 402 U.S. 1 [28 L.Ed.2d 554, 91 S.Ct. 1267]; *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 950-951 [92 Cal.Rptr. 309, 479 P.2d 669]), to require a school system to provide instruction in English to students of Chinese ancestry (*Lau* v. *Nichols* (1974) 414 U.S. 563 [39 L.Ed.2d 1, 94 S.Ct. 786]),[10] and to uphold the right of certain non-English speaking persons to vote (*Katzenbach* v. *Morgan* (1966) 384 U.S. 641 [16 L.Ed.2d 828, 86 S.Ct. 1717]; *Castro* v. *State of California* (1970) 2 Cal.3d 223 [85 Cal.Rptr. 20, 466 P.2d 244]). These cases differ from the special admission program in at least one critical respect, however. In none of them did the extension of a right or benefit to a minority have the effect of depriving persons who were not members of a minority group of benefits which they would otherwise have enjoyed.

The University suggests that this distinction is not apposite with respect to the school integration decisions because the effort to integrate schools discommodes nonminorities by requiring some to attend schools in neighborhoods other than their own. We cannot accept this as a valid analogy. Whatever the inconveniences and whatever the techniques employed to achieve integration, no child is totally deprived of an education because he cannot attend a neighborhood school, and all students, whether or not they are members of a minority race, are subject

---

[10] *Lau* was decided under section 601 of the Civil Rights Act of 1964 (42 U.S.C. § 2000d).

to equivalent burdens. As the Supreme Court has said numerous times since *Brown* v. *Board of Education* (1954) 347 U.S. 483 [98 L.Ed. 873, 74 S.Ct. 686, 38 A.L.R.2d 1180], there is no right to a segregated education. The disadvantages suffered by a child who must attend school some distance from his home or is transferred to a school not of his qualitative choice cannot be equated with the absolute denial of a professional education, as occurred in the present case.

 It is plain that the special admission program denies admission to some white applicants solely because of their race.[11] Of the 100 admission opportunities available in each year's class, 16 are set aside for disadvantaged minorities, and the committee admits applicants who fall into this category until these 16 places are filled. Since the pool of applicants available in any year is limited, it is obvious that this procedure may result in acceptance of minority students whose qualifications for medical study, under the standards adopted by the University itself, are inferior to those of some white applicants who are rejected.

This situation occurred in 1973 and 1974. The combined numerical rating assigned by the committee to each applicant who is granted an interview includes not only an evaluation of his academic scores but an assessment of all factors which the committee considers relevant to the successful pursuit of medical studies, such as an applicant's motives, character, and academic grades. This combined rating, with a few special exceptions, serves as the "benchmark" for admission.

The dissent charges that the combined numerical rating of an applicant does not include all his qualifications because it does not contain one factor favorable to disadvantaged minority applicants, i.e., their race or ethnic background. This suggestion is based upon the theory of the dissent that minority status in and of itself constitutes a substantive qualification for medical study and that, therefore, the fact that the combined numerical rating of a minority applicant accepted for admission was lower than the rating of a white rejected for admission does not

---

[11]The dissent states that whites are not excluded on racial grounds because the great majority of the applicants accepted are white. However, the fact that not all whites are excluded because of their race does not mean that some of them do not suffer such discrimination. In any event, Bakke alleges that *he* was excluded because he was white, and that the special admission program is unconstitutional for that reason; it is to this issue which we must address ourselves.

The dissent speaks of the majority's "disproportionate advantage" (*post*, p. 75), but it fails to suggest how Bakke, rejected by the medical school, enjoys disproportionate or any advantage.

mean that the minority applicant was less qualified than the white student. (*Post,* p. 82, fn. 11.) But this argument simply assumes the answer to the question at issue. Bakke claims that minority status is not a relevant consideration in determining whether an applicant is qualified for admission, and that admission decisions must be made without regard to the racial or ethnic background of a prospective student. To accept at the outset the premise that a minority applicant may be better qualified *because* of his race would foreclose consideration of the constitutional issue raised by the complaint.

The rating of some students admitted under the special program in 1973 and 1974 was as much as 30 points below that assigned to Bakke and other nonminority applicants denied admission. Furthermore, white applicants in the general admission program with grade point averages below 2.5 were, for that reason alone, summarily denied admission, whereas some minority students in the special program were admitted with grade point averages considerably below 2.5. In our view, the conclusion is inescapable that at least some applicants were denied admission to the medical school solely because they were not members of a minority race.

The fact that all the minority students admitted under the special program may have been qualified to study medicine does not significantly affect our analysis of the issues. In the first place, as the University freely admits, Bakke was also qualified for admission, as were hundreds, if not thousands of others who were also rejected. In this context the only relevant inquiry is whether one applicant was more qualified than another. Secondly, Bakke alleged that he and other nonminority applicants were *better* qualified for admission than the minority students accepted under the special admission program, and the question we must decide is whether the rejection of better qualified applicants on racial grounds is constitutional.

The issue to be determined thus narrows to whether a racial classification which is intended to assist minorities, but which also has the effect of depriving those who are not so classified of benefits they would enjoy but for their race, violates the constitutional rights of the majority.[12]

---

[12]We question the characterization by the dissent of racial classifications which favor minorities as "benign." That description in the present context is deemed to mean "favorable"; and while there can be no doubt that the special admission program is favorable to minorities, it certainly cannot be said to favor the majority. As the Washington Supreme Court forthrightly declared in its original opinion, ". . . the

Two distinct inquiries emerge at this point; first, what test is to be used in determining whether the program violates the equal protection clause; and second, does the program meet the requirements of the applicable test.

■ The general rule is that classifications made by government regulations are valid "if any state of facts reasonably may be conceived" in their justification. (*McGowan* v. *Maryland* (1961) 366 U.S. 420, 426 [6 L.Ed.2d 393, 399, 81 S.Ct. 1101].) This yardstick, generally called the "rational basis" test, is employed in a variety of contexts to determine the validity of government action (e.g., *Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1, 8 [39 L.Ed.2d 797, 803-804, 94 S.Ct. 1536]; *Dandridge* v. *Williams* (1970) 397 U.S. 471, 485 [25 L.Ed.2d 491, 501-502, 90 S.Ct. 1153]) and its use signifies that a reviewing court will strain to find any legitimate purpose in order to uphold the propriety of the state's conduct.

But in some circumstances a more stringent standard is imposed. Classification by race is subject to strict scrutiny, at least where the classification results in detriment to a person because of his race.[13] In the case of such a racial classification, not only must the purpose of the classification serve a "compelling state interest," but it must be demonstrated by rigid scrutiny that there are no reasonable ways to achieve the state's goals by means which impose a lesser limitation on the rights of the group disadvantaged by the classification. The burden in both respects is upon the government. (E.g., *Dunn* v. *Blumstein* (1972) 405 U.S. 330, 342-343 [31 L.Ed.2d 274, 284, 92 S.Ct. 995]; *Loving* v. *Virginia* (1967) 388 U.S. 1, 11 [18 L.Ed.2d 1010, 1017, 87 S.Ct. 1817]; *McLaughlin* v. *Florida* (1964) 379 U.S. 184, 192-193 [13 L.Ed.2d 222, 228-229, 85 S.Ct. 283].) It has been more than three decades since any decision of the United States Supreme Court upheld a classification which resulted in detriment solely on the basis of race: *Korematsu* v. *United States* (1944) 323 U.S. 214 [89 L.Ed. 194, 65 S.Ct. 193], and *Hirabayashi* v. *United States* (1943) 320 U.S. 81 [87 L.Ed. 1774, 63 S.Ct. 1375], both of which were war-inspired cases that have been severely criticized subsequently.[14]

---

minority admissions policy is certainly not benign with respect to nonminority students who are displaced by it." (*De Funis* v. *Odegaard, supra,* 507 P.2d 1169, at p. 1182.)

[13]In some of the cases cited above, in which a benefit to one racial group did not cause detriment to another, the United States Supreme Court has employed the more lenient "rational basis" test. (E.g., *Katzenbach* v. *Morgan, supra,* 384 U.S. 641, 651, 657-658 [16 L.Ed.2d 828, 839, 86 S.Ct. 1717].)

[14]E.g., Rostow, *The Japanese-American Cases—A Disaster* (1945) 54 Yale L.J. 489.

The University asserts that the appropriate standard to be applied in determining the validity of the special admission program is the more lenient "rational basis" test. It contends that the "compelling interest" measure is applicable only to a classification which discriminates against a minority, reasoning that racial classifications are suspect only if they result in invidious discrimination (e.g., *Brown* v. *Board of Education, supra,* 347 U.S. 483, 494 [98 L.Ed. 873, 880]); and that invidious discrimination occurs only if the classification excludes, disadvantages, isolates, or stigmatizes a minority or is designed to segregate the races. The argument is that white applicants denied admission are not stigmatized in the sense of having cast about them an aura of inferiority; therefore, it is sufficient if the special admission program has a rational relation to the University's goals.

We cannot agree with the proposition that deprivation based upon race is subject to a less demanding standard of review under the Fourteenth Amendment if the race discriminated against is the majority, rather than a minority. We have found no case so holding,[15] and we do not hesitate to reject the notion that racial discrimination may be more easily justified against one race than another, nor can we permit the validity of such discrimination to be determined by a mere census count of the races.[16]

That whites suffer a grievous disadvantage by reason of their exclusion from the University on racial grounds is abundantly clear. The fact that they are not also invidiously discriminated against in the sense that a stigma is cast upon them because of their race, as is often the

---

[15]*Alevy* v. *Downstate Medical Center* (1976) 39 N.Y.2d 326 [384 N.Y.Supp.2d 82], which involved the constitutionality of a preferential admission program, contains language by way of dictum that the appropriate test in deciding the constitutionality of such a program is neither of the two discussed above, but a third standard which the court claimed is gradually evolving in recent decisions of the United States Supreme Court. We discuss this case *infra.*

[16]A convincing refutation of the University's argument is made by a commentator as follows: "The argument that a racial classification which discriminates against white people is not inherently suspect implies that the white majority is monolithic and so politically powerful as not to require the constitutional safeguards afforded minority racial groups. But the white majority is pluralistic, containing within itself a multitude of religious and ethnic minorities—Catholics, Jews, Italians, Irish, Poles—and many others who are vulnerable to prejudice and who to this day suffer from the effects of past discrimination. Such groups have only recently begun to enjoy the benefits of a free society and should not be exposed to new discriminatory bars, even if they are raised in the cause of compensation to certain racial minorities for past inequities." (Lavinsky, *De Funis* v. *Odegaard; The "Non-Decision" With A Message* (1975) 75 Colum.L.Rev. 520, 527.)

circumstance when the discriminatory conduct is directed against a minority, does not justify the conclusion that race is a suspect classification only if the consequences of the classification are detrimental to minorities.

■ Regardless of its historical origin, the equal protection clause by its literal terms applies to "any person,"[17] and its lofty purpose, to secure equality of treatment to all, is incompatible with the premise that some races may be afforded a higher degree of protection against unequal treatment than others.

Although there are no decisions of the United States Supreme Court directly in point, recent decisions of the high court demonstrate a marked reluctance to apply different standards to determine the rights of minorities and members of the majority. Thus, in *McDonald* v. *Santa Fe Trail Transportation Co.* (1976) 427 U.S. 273 [49 L.Ed.2d 493 96 S.Ct. 2574], the court held that title VII and section 1981 of title 42 of the United States Code prohibit discrimination against all races on the same terms. Significantly, the court relied upon the broad language of these statutes, which protect "any individual" and "all persons" from discrimination. Indeed, in spite of the fact that section 1981 states that "all persons . . . shall have the same right in every State . . . to make and enforce contracts . . . as is enjoyed by *white* citizens" (italics added), and that the "immediate impetus" for the statute upon which section 1981 was based "was the necessity for further relief of the Constitutionally emancipated former Negro slaves" the court found that the history of the measure justified the conclusion that it was intended to apply on equal terms to all races.[18]

---

[17]The Supreme Court has emphasized that "The rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights. It is, therefore, no answer to these petitioners to say that the courts may also be induced to deny white persons rights of ownership and occupancy on grounds of race or color. Equal protection of the laws is not achieved through indiscriminate imposition of inequalities." (*Shelley* v. *Kraemer* (1948) 334 U.S. 1, 22 [92 L.Ed. 1161, 1185, 68 S.Ct. 836, 3 A.L.R.2d 441].)

[18]Although the Fourteenth Amendment was originally enacted to secure the freedom and equality of blacks, its protection has been extended to other races as well, and members of all races share in the protection afforded by that provision. (*Yick Wo* v. *Hopkins* (1886) 118 U.S. 356, 369 [30 L.Ed. 220, 226, 6 S.Ct. 1064]; *Slaughter-House Cases* (1873) 83 U.S. (16 Wall.) 36, 71-72 [21 L.Ed. 394].) Some statements of the United States Supreme Court imply that all racial classifications which result in a detriment are measured by the "compelling interest" test. (E.g., *Hirabayashi* v. *United States, supra,* 320 U.S. 81, 100 [87 L.Ed. 1774, 1785-1786]; *Loving* v. *Virginia, supra,* 388 U.S. 1, 9 [18 L.Ed.2d 1010, 1016]; *McLaughlin* v. *Florida, supra,* 379 U.S. 184, 191-192 [13 L.Ed.2d 222, 227-229]; but see *Korematsu* v. *United States, supra,* 323 U.S. 214, 216 [89 L.Ed. 194,

■ We come, then, to the question whether the University has demonstrated that the special admission program is necessary to serve a compelling governmental interest and that the objectives of the program cannot reasonably be achieved by some means which would impose a lesser burden on the rights of the majority.

The University seeks to justify the program on the ground that the admission of minority students is necessary in order to integrate the medical school and the profession.[19] The presence of a substantial number of minority students will not only provide diversity in the student body, it is said, but will influence the students and the remainder of the profession so that they will become aware of the medical needs of the minority community and be encouraged to assist in meeting those demands.[20] Minority doctors will, moreover, provide role models for younger persons in the minority community, demonstrating to them that they can overcome the residual handicaps inherent from past discrimination.

Furthermore, the special admission program will assertedly increase the number of doctors willing to serve the minority community, which is desperately short of physicians. While the University concedes it cannot guarantee that all the applicants admitted under the special program will ultimately practice as doctors in disadvantaged communities, they have expressed an interest in serving those communities and there is a likelihood that many of them will thus fashion their careers.

198-199]; Wright, *The Role of the Supreme Court* (1968) 54 Cornell L.Rev. 1, 18; Ely, *The Constitutionality of Reverse Racial Discrimination* (1974) 41 U.Chi.L.Rev. 723, 727-735.)

Ely suggests that classification by race is not suspect if a member of the majority race discriminates against others of the same race because the majority is not likely to underestimate the needs and qualifications of persons of the same race and because the discrimination would not be motivated by racial prejudice. We find wholly unacceptable the notion that racial discrimination may be more readily justified because the persons who make the decision to discriminate belong to the same racial group as the person discriminated against. The right to equal protection of the laws is personal. (*Shelley* v. *Kraemer, supra,* 334 U.S. at p. 22 [92 L.Ed. at p. 1185]; *Mitchell* v. *United States* (1941) 313 U.S. 80, 97 [85 L.Ed. 1201, 1212, 61 S.Ct. 873]). Surely the complexion of the person who discriminates cannot be a significant factor in deciding whether an individual has been deprived of his right to equal protection.

[19]The total number of blacks, Mexican-Americans, American Indians, and mainland Puerto Ricans enrolled in medical schools between 1969 and 1974 was only 8 percent. (Assn. of American Medical Colleges, Medical School Admission Requirements (1976) table 6-C, p. 52.)

[20]No one can gainsay the premise that a university is more than an edifice of classrooms; it is a composite intellectual atmosphere to which both the faculty and students contribute substantially.

Finally, it is urged, black physicians would have a greater rapport with patients of their own race and a greater interest in treating diseases which are especially prevalent among blacks, such as sickle cell anemia, hypertension, and certain skin ailments.

We reject the University's assertion that the special admission program may be justified as compelling on the ground that minorities would have more rapport with doctors of their own race and that black doctors would have a greater interest in treating diseases prevalent among blacks. The record contains no evidence to justify the parochialism implicit in the latter assertion; and as to the former, we cite as eloquent refutation to racial exclusivity the comment of Justice Douglas in his dissenting opinion in *De Funis*: "The Equal Protection Clause commands the elimination of racial barriers, not their creation in order to satisfy our theory as to how society ought to be organized. The purpose of the University of Washington cannot be to produce black lawyers for blacks, Polish lawyers for Poles, Jewish lawyers for Jews, Irish lawyers for Irish. It should be to produce good lawyers for Americans . . . ." (416 U.S. at p. 342 [40 L.Ed.2d at p. 183].)

We may assume arguendo that the remaining objectives which the University seeks to achieve by the special admission program meet the exacting standards required to uphold the validity of a racial classification insofar as they establish a compelling governmental interest. Nevertheless, we are not convinced that the University has met its burden of demonstrating that the basic goals of the program cannot be substantially achieved by means less detrimental to the rights of the majority.

The two major aims of the University are to integrate the student body and to improve medical care for minorities. In our view, the University has not established that a program which discriminates against white applicants because of their race is necessary to achieve either of these goals.

It is the University's claim that if special consideration is not afforded to disadvantaged minority applicants, almost none of them would gain admission because, no matter how large the pool of applicants, the grades and test scores of most minority applicants are lower than those of white applicants. In support of this assertion, the University declared that in the two years before the special admission program was

instituted, only two blacks and one Mexican-American qualified for admission, whereas between 1970 and 1974, while the program was in operation, 33 Mexican-Americans, 26 blacks, and 1 American Indian were admitted.[21] But this showing is insufficient to satisfy the University's burden. For there is no evidence as to the nature of the admission standards prior to 1969, when the special admission program began, and it may well be that virtually determinative weight was accorded to test scores and grades. Thus the fact that few minorities were accepted before 1969 was not necessarily the result of the absence of a preference for minorities on strictly racial grounds.

We observe and emphasize in this connection that the University is not required to choose between a racially neutral admission standard applied strictly according to grade point averages and test scores, and a standard which accords preference to minorities because of their race.

While minority applicants may have lower grade point averages and test scores than others, we are aware of no rule of law which requires the University to afford determinative weight in admissions to these quantitative factors. In practice, colleges and universities generally consider matters other than strict numerical ranking in admission decisions. (O'Neil, *Preferential Admissions: Equalizing the Access of Minority Groups to Higher Education* (1971) 80 Yale L.J. 699, 701-705.) The University is entitled to consider, as it does with respect to applicants in the special program, that low grades and test scores may not accurately reflect the abilities of some disadvantaged students; and it may reasonably conclude that although their academic scores are lower, their potential for success in the school and the profession is equal to or greater than that of an applicant with higher grades who has not been similarly handicapped.[22]

In addition, the University may properly as it in fact does, consider other factors in evaluating an applicant, such as the personal interview,

---

[21] Six Mexican-Americans, 1 black, and 41 Asians were admitted between 1970 and 1974 without the aid of the program, and 12 Asians were admitted under the program.

[22] The view that minority enrollment may be increased by revising admission standards to focus on the disadvantaged has been criticized on the ground that without racially discriminatory programs, a very large increase in the percentage of disadvantaged students accepted for admission would be required in order to achieve substantial integration, resulting in the exclusion of significant numbers of the most talented applicants. (Sandalow, *Racial Preferences in Higher Education: Political Responsibility and the Judicial Role* (1975) 42 U.Chi.L.Rev. 653, 690-691.) We note, however, that of the total number of students who applied for the special admission program, only one in five was white.

recommendations, character, and matters relating to the needs of the profession and society, such as an applicant's professional goals. In short, the standards for admission employed by the University are not constitutionally infirm except to the extent that they are utilized in a racially discriminatory manner. Disadvantaged applicants of all races must be eligible for sympathetic consideration, and no applicant may be rejected because of his race, in favor of another who is less qualified, as measured by standards applied without regard to race.[23] We reiterate, in view of the dissent's misinterpretation, that we do not compel the University to utilize only "the highest objective academic credentials" as the criterion for admission.

In addition to flexible admission standards, the University might increase minority enrollment by instituting aggressive programs to identify, recruit, and provide remedial schooling for disadvantaged students of all races who are interested in pursuing a medical career and have an evident talent for doing so.

Another ameliorative measure which may be considered is to increase the number of places available in the medical schools, either by allowing additional students to enroll in existing schools or by expanding the schools. In 1974, the University received almost 40 applications for each place available, and the entering class in all the medical schools in the state in the last academic year totalled only 1,094 students. (Assn. of American Medical Colleges, Medical School Admission Requirements (1976) table 2-B, pp. 11-12.)

None of the foregoing measures can be related to race, but they will provide for consideration and assistance to individual applicants who have suffered previous disabilities, regardless of their surname or color. So far as the record discloses, the University has not considered the adoption of these or other nonracial alternatives to the special admission program.

Whether these measures, taken together, will result in the enrollment of precisely the same number of minority students as under the current

---

[23]Justice Douglas in his opinion in *De Funis* adopts a similar rationale. He states, "There is no constitutional right for any race to be preferred. . . . There is no superior person by constitutional standards. A De Funis who is white is entitled to no advantage by reason of that fact; nor is he subject to any disability no matter what his race or color. Whatever his race, he had a constitutional right to have his application considered on its individual merits in a racially neutral manner." (416 U.S. at pp. 336-337 [40 L.Ed.2d at p. 180].)

special admission program, no one can determine. It may be that in some years there would be fewer and in some years more minorities enrolled than under the present scheme. But even if somewhat fewer minority applicants are admitted without a program which focuses on race, the University has not shown that the second major objective of the program—the need for more doctors to serve the minority community—will be appreciably impaired. This shortage is perhaps the most serious of the problems which the University seeks to correct by means of its program. According to statistics cited by the University and amici curiae, the National Lawyers Guild and the Mexican-American Legal Defense Fund, blacks and other races have a life expectancy of 6.3 years less than whites, their maternal mortality rate is three times higher than that of whites, and their infant mortality is almost twice as high. (U.S. Dept. of Commerce, Bureau of the Census, Current Population Reports: The Social and Economic Status of the Black Population in the U.S. (1974) tables 82, 84.) We do not doubt that amelioration of this societal infirmity is one of the most urgent tasks of the medical schools and the medical profession.

We question, however, whether the University has established that the special admission program is the least intrusive or even the most effective means to achieve this goal. The University concedes it cannot assure that minority doctors who entered under the program, all of whom expressed an "interest" in practicing in a disadvantaged community, will actually do so. It may be correct to assume that some of them will carry out this intention, and that it is more likely they will practice in minority communities than the average white doctor. (See Sandalow, *Racial Preferences in Higher Education: Political Responsibility and the Judicial Role* (1975) 42 U.Chi.L.Rev. 653, 688.) Nevertheless, there are more precise and reliable ways to identify applicants who are genuinely interested in the medical problems of minorities than by race. An applicant of whatever race who has demonstrated his concern for disadvantaged minorities in the past and who declares that practice in such a community is his primary professional goal would be more likely to contribute to alleviation of the medical shortage than one who is chosen entirely on the basis of race and disadvantage. In short, there is no empirical data to demonstrate that any one race is more selflessly socially oriented or by contrast that another is more selfishly acquisitive.

Moreover, while it may be true that the influence exerted by minorities upon the student body and the profession will persuade some

nonminority doctors to assist in meeting these community medical needs, it is at best a circuitous and uncertain means to accomplish the University's objective. It would appear that more directly effective methods can be devised, such as academic and clinical courses directed to the medical needs of minorities, and emphasis upon the training of general practitioners to serve the basic needs of the poor.[24]

The University cites certain cases in support of its position. A substantial number of decisions, most of them determined under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) have upheld the right of minorities to preference in *employment.* (E.g., *Franks* v. *Bowman Transportation, Inc.* (1976) 424 U.S. 747 [47 L.Ed.2d 444, 96 S.Ct. 1251]; *United States* v. *Masonry Cont. Ass'n of Memphis, Inc.* (6th Cir. 1974) 497 F.2d 871, 874, 877; *NAACP* v. *Allen* (5th Cir. 1974) 493 F.2d 614, 617, 622; *Carter* v. *Gallagher* (8th Cir. 1971) 452 F.2d 315, 318, 331; *United States* v. *Ironworkers Local 86* (9th Cir. 1971) 443 F.2d 544, 548, 554.) The University asserts that these decisions establish the validity of a preference to minorities on the basis of race even if the classification results in detriment to the majority.

The authorities are not persuasive. In all these cases the court found that the defendant had practiced discrimination in the past and that the preferential treatment of minorities was necessary to grant them the opportunity for equality which would have been theirs but for the past discriminatory conduct. Absent a finding of past discrimination—and thus the need for remedial measures to compensate minorities for the prior discriminatory practices of the employer—the federal courts, with one exception, have held that the preferential treatment of minorities in employment is invalid on the ground that it deprives a member of the

---

[24]According to one study, a major problem with the health care system is the "gross misallocation of sophisticated medical talent, distortions that reflect the attractions of income, not the attractions to service . . . . [T]he highest paid serve those areas which, by all standards, are already saturated with service . . . . The problem is not volume of service, but distribution of service. The system has been described as a mixture of technical virtuosity among specialists, on the one hand, with inadequacies in the development of minimum essential care on the other." (Sultan & Therrio, Cal. Health Manpower, Need to 1980, Cal. Regional Medical Program, Oakland, 1974.) Other commentators have estimated that while there are 85 specialists practicing for each 100,000 Californians, 66 specialists would represent an adequate distribution; and that there are only 34 general practitioners serving the same population, whereas 50 would be required for an adequate level of care. (Paxton, *Doctor Shortage? It's Narrowing Down to Primary Care* (Mar. 1973) Medical Economics p. 104; O'Sullivan, The Health Manpower Sourcebook (Health Services Education Council, San Jose, 1973) p. 3.11.)

majority of a benefit because of his race.[25] (*Chance v. Board of Examiners* (2d Cir. 1976) 534 F.2d 993; *Kirkland v. New York St. Dept. of Correctional Serv.* (2d Cir. 1975) 520 F.2d 420, 427-428; *Weber v. Kaiser Aluminum & Chemical Corp.* (E.La. 1976) 415 F.Supp 761, *Brunetti v. City of Berkeley* (N.D.Cal. 1975) H C-74-0051 RFP;[26] *Anderson v. San Francisco Unified School District* (N.D.Cal. 1972) 357 F.Supp. 248, 250.)[27]

It is important to observe that all of these cases, with the exception of *Weber,* hold that it is unconstitutional reverse discrimination to grant a

---

[25]The dissent challenges this statement as overbroad, claiming that a number of cases have compelled "affirmative action" in the employment context, absent a showing that a particular employer has engaged in racial discrimination in the past. In fact, in all the federal cases cited by the dissent for this proposition (*post,* p. 71, fn. 6), there was a finding by either a court or an administrative agency that the labor· unions which supplied employees to the employer had been guilty of discriminatory practices. In *Weiner v. Cuyahoga Community College District* (1969) 19 Ohio St.2d 35 [48 Ohio Ops.2d 4, 249 N.E.2d 907], the employer was required only to give "unequivocal assurance of positive equal employment opportunity efforts" and was not called upon to assure that a certain percentage of persons hired would be from the minority community.

Furthermore, the dissent erroneously claims that *Washington v. Davis* (1976) 426 U.S. 229 [48 L.Ed.2d 597, 96 S.Ct. 2040], stands for the proposition that "benign" racial classifications are constitutional. (*Post,* pp. 71-72.) That case holds only that affirmative efforts of the Washington D.C. police department to recruit black officers negates any inference that the department was guilty of discrimination.

[26]*Brunetti* is not published in federal reports.

[27]The University attempts to distinguish *Anderson* on the ground that the regulations in that case would have resulted in according a preference to minorities for almost all the administrative assignments and promotions, whereas here only 16 out of 100 places are reserved for minorities. But *Anderson* is not so easily distinguishable. The opinion leaves no doubt that the reason for striking down the regulation was not that an excessive number of minorities was preferred over whites, but that they were preferred at all absent a finding that the defendant had been guilty of prior discriminatory conduct.

The sole exception to the rule stated above is *Porcelli v. Titus* (3d Cir. 1970) 431 F.2d 1254. In that case, the board of education abolished the list previously used to promote employees to the position of principal or vice-principal in the Newark school system. The persons on the list had been chosen by competitive examination. Instead of utilizing the list, the promotions were made by the school board upon recommendation of the superintendent of schools, who used the race of a candidate as one factor in making his recommendations. He asserted that the system of making promotions from the list was outmoded because the number of minority students in the schools had increased dramatically since the system was adopted and that the academic performance of the students would be enhanced by an increase in the number of minority principals and vice principals. The teachers at the top of the list, who had been denied promotion, asserted that their constitutional rights had been violated. The court found against them, reasoning that the purpose of abolishing the promotional list was to integrate the faculty rather than to discriminate against the plaintiffs. The decision, with little discussion, applied the integration rationale of *Brown v. Board of Education,* without recognizing the distinction between a classification which grants a benefit to one race at the expense of

preference to a minority employee in the absence of a showing of prior discrimination by the particular employer granting the preference. Obviously, this principle would apply whether the preference was compelled by a court or voluntarily initiated by the employer. Moreover, *Brunetti, Anderson* and *Weber* all invalidated voluntary programs of preference for minorities.[28] Thus, there is no merit in the assertion of the dissent that there is some undefined constitutional significance to the fact that the University elected to adopt the special admission program and was not compelled to do so by court order. To the victim of racial discrimination the result is not noticeably different under either circumstance.

There is no evidence in the record to indicate that the University has discriminated against minority applicants in the past. Nevertheless amici curiae ask that we find, by analogy to the employment discrimination cases, that the University's reliance on grade point averages and the Medical College Admission Test in evaluating applicants amounted to discrimination in fact against minorities. Amici claim that the application of these quantitative measures by the University had resulted in the exclusion of a disproportionate number of minority applicants, that grades and test scores are not significantly related to a student's performance in medical school or in the profession, and that the test is culturally biased. In the recent case of *Washington* v. *Davis, supra,* 426 U.S. 229, the United States Supreme Court has made it clear that the standard for adjudicating claims of racial discrimination on constitutional grounds is not the same as the standard applicable to cases decided under title VII, and that absent a racially discriminatory purpose, a test is not invalid solely because it may have a racially disproportionate impact. Thus, the fact that minorities are underrepresented at the University would not suffice to support a determination that the University has discriminated against minorities in the past. (See also *Tyler* v. *Vickery* (5th Cir. 1975) 517 F.2d 1089, 1095.) In any event, we are not called upon to decide the issue raised by amici in the present case. Neither party contended in the trial court that the University had practiced discrimina-

---

another and one which does not have that effect. This decision cannot be harmonized with the other federal decisions cited above, with which it is clearly in conflict, and we do not find its reasoning persuasive.

[28]For example, in *Brunetti,* the justification for the preference was a "history of discriminatory practices throughout all segments of American society" but the program was held to be invalid because there was no determination that the city had previously engaged in discriminatory practices, and in fact, the city consistently maintained, as does the University in the present case, that it had never discriminated against minorities.

tion, and no evidence with regard to that question was admitted below.[29] Thus, on the basis of the record before us, we must presume that the University has not engaged in past discriminatory conduct.

The University relies upon *Alevy* v. *Downstate Medical Center, supra,* 384 N.Y.Supp.2d 82. There, as here, a white medical student alleged that he had been discriminated against in admission to a publicly funded medical school because of preferences accorded to black and Puerto Rican applicants in the admission program. Although the court found that the school had discriminated in favor of the minority applicants, it did not decide whether the preference was constitutional. Rather, it held that the petitioner did not demonstrate his right to relief because he had failed to show that he would have been admitted if no preference had been extended to minority applicants. The opinion contains dictum which is in conflict with some of our reasoning, but the court's holding is not at variance with our determination that the special admission program is invalid.[30]

---

[29]Admittedly, neither the University nor Bakke would have an interest in raising such a claim. But this fact alone would not justify us in making a finding on a factual matter not presented below.

[30]In the course of the opinion, the court declared that a preference to minorities in university admissions is permissible if the state has a substantial interest in the program and that such an interest would be found if, on balance, the gain to be derived from the preferential policy outweighs its possible detrimental effects. It rejected the "compelling interest" standard which we have applied on the ground that the Fourteenth Amendment was adopted to guarantee equality for blacks and "by logical extension has come to include all minority groups" and that it would be "ironic and . . . would cut against the very grain of the amendment" were that provision used "to strike down measures designed to achieve real equality for persons whom it was intended to aid." (384 N.Y.Supp.2d at p. 89.) The court acknowledged that a showing must be made that no nonracial alternative would serve the same purpose as a racially discriminatory policy and, although its language is not entirely clear, it implied that the burden was upon the university to show that the preferential program fulfilled a substantial state interest and that there were no less intrusive alternatives available.

The opinion in *Alevy* did not decide if the preferential program met a substantial state interest or whether an alternative less disadvantageous to the majority could have been devised, since it held that the petitioner would not have been admitted even in the absence of the program.

The dictum in *Alevy* appears to conflict with our analysis in this opinion only to the extent that it fails to apply the "compelling interest" measure. Since we have assumed, in this opinion, arguendo, that with minor exceptions the University has demonstrated that the special admission program serves a compelling state interest, even this conflict between the language of the New York court and this opinion is more apparent than real. *Alevy* suggests that the burden of showing that the state's interest cannot be met by less intrusive means remains with the discriminator—an approach consistent with that which we adopt here. In sum, the decision in *Alevy* does not provide a convincing refutation of our determination that the special admission program is invalid.

Few legal issues in recent years have troubled and divided legal commentators as much as that which we decide today. Observers of varied persuasion have demonstrated an ambivalence regarding the lawfulness and social desirability of preferential admission policies. These doubts, induced by disturbed sensibilities, are readily comprehensible.

On the one hand, it is urged that preferential treatment for minorities is essential in order to afford them an opportunity to enjoy the benefits which would have been theirs but for more than a century of exploitation and discrimination by the prevailing majority. Although legal impediments to equality have been removed by the judiciary and by the Congress, goes the argument, minorities still labor under severe handicaps. To achieve the American goal of true equality of opportunity among all races, more is required than merely removing the shackles of past formal restrictions; in the absence of special assistance, minorities will become a "self-perpetuating group at the bottom level of our society who have lost the ability and the hope of moving up." (Kaplan, *Equal in an Unequal World: Equality for the Negro—The Problem of Special Treatment* (1966) 61 Nw.U.L.Rev. 363, 374.) Preferential admissions will be necessary only until minorities can compete on an equal basis, and will benefit not only the applicant who is specially treated, but also the minority community in general.[31]

The persuasiveness of these arguments cannot be denied, for the ends sought by such programs are clearly just if the benefit to minorities is viewed in isolation. But there are more forceful policy reasons against preferential admissions based on race. The divisive effect of such

---

[31]The dissenting opinion justifies the special admission program on the ground that minorities have historically been the victims of discrimination and that preferences in their favor would provide diversity in the student body and integrate the University and the medical profession. This reasoning would sanction preferences on racial or ethnic grounds in all areas of society in which minorities are underrepresented if such preferences are "directly and reasonably related to the attainment of integration." (*Post,* p. 81.) In an analogous situation, the Supreme Court has recently cautioned against the adoption of a rule which would have such far-flung consequences. In *Washington* v. *Davis, supra,* 426 U.S. 239, the high court held that, in order to establish unconstitutional discrimination, it was not sufficient to show that more black than white police recruits failed a written test, but that the plaintiffs were required to demonstrate that the test had a racially discriminatory purpose. In the course of its opinion, the court stated, "A rule that a statute designed to serve neutral ends is nevertheless invalid, absent compelling justification, if in practice it benefits or burdens one race more than another would be far reaching and would raise serious questions about, and perhaps invalidate, a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white." (426 U.S. at p. 248 [48 L.Ed.2d at p. 612].)

preferences needs no explication and raises serious doubts whether the advantages obtained by the few preferred are worth the inevitable cost to racial harmony.[32] The overemphasis upon race as a criterion will undoubtedly be counterproductive: rewards and penalties, achievements and failures, are likely to be considered in a racial context through the school years and beyond. Pragmatic problems are certain to arise in identifying groups which should be preferred or in specifying their numbers, and preferences once established will be difficult to alter or abolish; human nature suggests a preferred minority will be no more willing than others to relinquish an advantage once it is bestowed. Perhaps most important, the principle that the Constitution sanctions racial discrimination against a race—any race—is a dangerous concept fraught with potential for misuse in situations which involve far less laudable objectives than are manifest in the present case.

While a program can be damned by semantics, it is difficult to avoid considering the University scheme as a form of an education quota system, benevolent in concept perhaps, but a revival of quotas nevertheless. No college admission policy in history has been so thoroughly discredited in contemporary times as the use of racial percentages. Originated as a means of exclusion of racial and religious minorities from higher education, a quota becomes no less offensive when it serves to exclude a racial majority. "No form of discrimination should be opposed more vigorously than the quota system." (McWilliams, A Mask For Privilege (1948) p. 238.)[33]

To uphold the University would call for the sacrifice of principle for the sake of dubious expediency and would represent a retreat in the struggle to assure that each man and woman shall be judged on the basis

---

[32]Frederick Douglass, the emancipated slave, perceived the problem clearly 130 years ago. In the Liberator for March 27, 1846, he wrote: "[T]hough I am more closely connected and identified with one class of outraged, oppressed and enslaved people, I cannot allow myself to be insensible to the wrongs and suffering of any part of the great family of man." (Graham, There Was Once a Slave (1947) p. 305.)

[33]In another context the Supreme Court has frowned upon the doctrine of rigid proportionality. In upholding the right of a state to ban picketing the purpose of which was to compel a store to hire Negroes in proportion to Negro customers, the high court held, "To deny to California the right to ban picketing in the circumstances of this case would mean that there could be no prohibition of the pressure of picketing to secure proportional employment on ancestral grounds of Hungarians in Cleveland, of Poles in Buffalo, of Germans in Milwaukee, of Portuguese in New Bedford, of Mexicans in San Antonio, of the numerous minority groups in New York, and so on through the whole gamut of racial and religious concentrations in various cities." (*Hughes* v. *Superior Court* (1950) 339 U.S. 460, 464 [94 L.Ed. 985, 991, 70 S.Ct. 718].)

of individual merit alone, a struggle which has only lately achieved success in removing legal barriers to racial equality. The safest course, the one most consistent with the fundamental interests of all races and with the design of the Constitution, is to hold, as we do, that the special admission program is unconstitutional because it violates the rights guaranteed to the majority by the equal protection clause of the Fourteenth Amendment of the United States Constitution.

### Bakke's Appeal

As set forth above, the trial court found that Bakke would not have been admitted to either the 1973 or 1974 entering class at the University even if there had been no special admission program. However, in reaching this conclusion the court ruled that the burden of proof remained with Bakke throughout the trial. He asserts that since he established that the University had discriminated against him because of his race, the burden of proof shifted to the University to demonstrate that he would not have been admitted even without the special admission program.

We agree. Under the general rule, the burden of proof would remain with plaintiff Bakke throughout the trial on the issue of his admission. (Evid. Code, § 500.) However, a substantial number of federal cases involving employment discrimination under title VII have held that if the plaintiff establishes that the employer has been guilty of discrimination in hiring or promotion, and he brings himself within the class of employees who suffered discrimination, the burden of showing that he was unqualified for the job or the promotion rests with the employer. (See, e.g., *Franks* v. *Bowman Transportation, Inc., supra,* 424 U.S.747, 772 [47 L.Ed.2d 444, 466, 96 S.Ct. 1251]; *Mims* v. *Wilson* (5th Cir. 1975) 514 F.2d 106, 110; *Meadows* v. *Ford Motor Company* (6th Cir. 1975) 510 F.2d 939, 948; *Baxter* v. *Savannah Sugar Refining Corporation* (5th Cir. 1974) 495 F.2d 437, 444-445.) As the United States Supreme Court stated in the *Franks* case, "No reason appears . . . why the victim rather than the perpetrator of the illegal act should bear the burden of proof . . . ." (424 U.S. at p. 773, fn. 32 [47 L.Ed.2d at p. 466].)

By analogy to these decisions, we hold that the trial court should have ruled that since Bakke successfully demonstrated that the University had unconstitutionally discriminated against him, the burden of proof shifted to the University to establish that he would not have been admitted to

the 1973 or 1974 entering class without the invalid preferences. In these circumstances, we would ordinarily remand the case to the trial court for the purpose of determining, under the proper allocation of the burden of proof, whether Bakke would have been admitted to the 1973 or 1974 entering class absent the special admission program. (See *Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756, 775 [91 Cal.Rptr. 745, 478 P.2d 465].)[34] However, on appeal the University has conceded that it cannot meet the burden of proving that the special admission program did not result in Bakke's exclusion. Therefore, he is entitled to an order that he be admitted to the University.

The judgment is affirmed insofar as it determines that the special admission program is invalid; the judgment is reversed insofar as it denies Bakke an injunction ordering that he be admitted to the University, and the trial court is directed to enter judgment ordering Bakke to be admitted. Bakke shall recover his costs on these appeals.

Wright, C. J., McComb, J., Sullivan, J., Clark, J., and Richardson, J., concurred.

**TOBRINER, J.,** Dissenting.—In 1969 the medical school of the University of California at Davis confronted the reality that reliance upon its traditional admission criteria had led it to become a nearly all-white, segregated institution. In response, the medical school voluntarily adopted the "special admission" program at issue in this case to overcome the exclusionary effect of its past policies and to achieve an integrated student body composed of qualified students of all races and ethnic groups.

The Davis medical school, of course, was not alone in perceiving and acting to ameliorate the grave problems resulting from a largely segregated medical school and a largely segregated medical profession. In the late 1960's and early 1970's over 100 medical schools throughout the country, including almost all of the most highly regarded medical institutions, instituted similar special admission programs aimed at increasing the enrollment of minority medical students and producing a more integrated medical profession. Moreover, in the past decade scores

---

[34]Because of the manifest prejudice to educational institutions if we were to require that our holding herein be applied so as to set aside admission decisions made in the past, the rule we announce shall, with the exceptions hereafter specified, govern only those admission decisions made after the date this opinion becomes final in this court. However, our holding shall apply to Bakke and any other applicants who have filed actions for judicial relief on similar grounds prior to the filing date of this opinion.

of other professional and graduate schools, as well as numerous undergraduate institutions, have implemented analogous "affirmative action" programs as part of a national effort to bring into the mainstream of American society members of minority groups who have long suffered discrimination and exclusion as a result of both governmental and private action.

By today's decision, the majority deliver a severe, hopefully not fatal, blow to these voluntary efforts to integrate our society's institutions and to ameliorate the continuing effects of past discrimination. Contrary to the majority's assertion, time-honored constitutional principles and precedent by no means establish that the special admission program at issue in this case violates the Fourteenth Amendment. Indeed, as I explain, past decisions of both the United States Supreme Court and this court clearly demonstrate the constitutional propriety of the admission program instituted by the medical school to integrate its student body.

In reaching the conclusion that the special admission program at issue here is unconstitutional, the majority proceed from two fundamentally flawed premises. First, the majority erroneously equate the racial classifications utilized by the medical school to achieve an integrated student body with the traditional "invidious" racial classifications embodied in laws or state policies which discriminated against blacks and other racial or ethnic minorities, and hold that the use of racial classifications even to promote integration is presumptively unconstitutional and "suspect." The governing authorities, however, lend no support to the conclusion that the use of racial classifications to ameliorate segregated conditions is presumptively unconstitutional. On the contrary, numerous decisions recognize that as a practical matter racial classifications frequently must be employed if the effects of past discrimination and exclusion are to be overcome and if integration of currently segregated institutions is to be achieved; these cases establish that the Constitution does not forbid such use of remedial racial classifications. By failing to distinguish between *invidious racial classifications* and remedial or *"benign" racial classifications,* the majority utilize the wrong constitutional standard in evaluating the validity of the Davis special admission program. This fundamental error inevitably infects and invalidates the majority's ultimate constitutional conclusion.

Second, the majority incorrectly assert that the minority students accepted under the special admission program are "less qualified"—under the medical school's own standards—than nonminority applicants rejected by the medical school. (See pp. 38, 47, *ante.*) This is simply not

the case. The record establishes that all the students accepted by the medical school are *fully qualified* for the study of medicine. By adopting the special admission program, the medical school has indicated that in its judgment differences in academic credentials among qualified applicants are not the sole nor best criterion for judging how qualified an applicant is in terms of his potential to make a contribution to the medical profession or to satisfy needs of both the medical school and the medical profession that are not being met by other students. In asserting that the accepted minority students are less qualified than rejected applicants, the majority in effect endow standardized test scores and grade point averages with a greater significance than the medical school attributes to them or than independent studies have shown they will bear.

In implementing the special admission program at issue here, the medical school determined that in light of the contemporary needs of the medical profession and of society generally, the attainment of a racially integrated, diverse medical school student body, made up of qualified students of all races, is more important than the perpetuation of a segregated medical school composed of students with the highest objective academic credentials. To date, courts have always respected a college or professional school's determination that the educational benefits of a diverse student body justify a departure from adherence to strict objective academic credentials for a particular group of applicants; such "preferential" policies have perhaps most commonly been adopted to promote geographic diversity, but similar admission preferences have regularly been employed to serve less compelling interests, for example to give preference to an applicant's athletic ability or to his relationship to an alumnus or institutional benefactor.

Unless it can be said that the promotion of integration is a constitutionally illegitimate purpose—a proposition which the majority obviously do not intend to embrace—I cannot understand how the admission policy at issue in this case can properly be found less permissible than these other long-accepted admission practices. There is, indeed, a very sad irony to the fact that the first admission program aimed at promoting diversity ever to be struck down under the Fourteenth Amendment is the program most consonant with the underlying purposes of the Fourteenth Amendment.

1. *The use of racial classifications to promote integration or to overcome the effects of past discrimination is neither "suspect" nor presumptively unconstitutional.*

There is no denying that racial classifications have played an odious role throughout our nation's history. In the course of the past 200 years, racial classifications have been utilized to subjugate racial and ethnic minorities to a separate and inferior existence in American society. At first, courts struck down only the most blatant use of racial classifications against minorities, invalidating laws which directly denied blacks or similar minorities basic legal rights and privileges enjoyed by the majority of citizens. (See, e.g., *Strauder* v. *West Virginia* (1880) 100 U.S. 303 [25 L.Ed. 664]; *Nixon* v. *Herndon* (1927) 273 U.S. 536 [71 L.Ed. 759, 47 S.Ct. 446]; *Yick Wo* v. *Hopkins* (1886) 118 U.S. 356 [30 L.Ed. 220, 6 S.Ct. 1064].)

Beginning with *Brown* v. *Board of Education* (1954) 347 U.S. 483 [98 L.Ed. 873, 74 S.Ct. 686, 38 A.L.R.2d 1180], the courts acknowledged the inherent inequalities of the "separate but equal" doctrine and struck down the racial classifications embodied in segregation laws, laws that, by officially excluding minorities from the principal governmental and social institutions utilized by the majority of Americans, stigmatized members of minority groups and consigned them to inherently inferior treatment. (See, e.g., *Gayle* v. *Browder* (1956) 352 U.S. 903 [1 L.Ed.2d 114, 77 S.Ct. 145]; *Holmes* v. *City of Atlanta* (1955) 350 U.S. 879 [100 L.Ed. 776, 76 S.Ct. 141].) More recently, courts have perceived the invidiousness of a somewhat more subtle use of racial classifications, and have invalidated laws embodying such classifications which coerced, facilitated or encouraged the private discrimination against minorities or the preservation of a segregated society. (See, e.g., *Anderson* v. *Martin* (1964) 375 U.S. 399 [11 L.Ed.2d 430, 84 S.Ct. 454]; *McLaughlin* v. *Florida* (1964) 379 U.S. 184 [13 L.Ed.2d 222, 85 S.Ct. 283]; *Loving* v. *Virginia* (1967) 388 U.S. 1 [18 L.Ed.2d 1010, 87 S.Ct. 1817]; *Hunter* v. *Erickson* (1969) 393 U.S. 385, 391 [21 L.Ed.2d 616, 89 S.Ct. 557]; cf. *Reitman* v. *Mulkey* (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627].)

In all of these cases the racial classifications at issue were utilized, explicitly or covertly, to stigmatize, exclude or accord inferior treatment to minorities. In this context, courts most properly held, time and again, that such "racial classifications" are constitutionally "suspect" and presumptively unconstitutional. Because the central purpose of the Fourteenth Amendment was to protect the black minority from the

discriminatory legal treatment it had previously suffered (see, e.g., *Slaughterhouse Cases* (1873) 83 U.S. (16 Wall.) 36, 81 [21 L.Ed. 394]; Bickel, *The Original Understanding and the Segregation Decision* (1955) 69 Harv.L.Rev. 1, 60), racial classifications which impose such inferior treatment upon minorities without doubt fundamentally conflict with the equal protection clause.

The racial classifications at issue in this case, however, are worlds apart from the invidious racial classifications deemed constitutionally suspect in prior cases. The racial classifications embodied in the special admission program are not intended to, nor do they in fact, exclude any particular racial group from participation in the medical school; on the contrary, the program is aimed at assuring that qualified applicants of all racial groups are actually represented in the institution.[1] Moreover, the racial classifications do not stigmatize any racial group as an "inferior" race, but instead give realistic recognition to the continuing effects resulting from several centuries of discriminatory treatment.[2] Finally, the racial classifications are not the instruments through which a majority's racial prejudice has imposed inferior treatment upon an impotent minority, but rather are remedial measures voluntarily implemented to give all students the distinct educational benefits flowing from an integrated education.

---

[1] The majority engage in indefensible rhetoric in suggesting that the medical school excluded whites on the basis of their race. (See p. 62, *ante*). The great majority of students admitted by the medical school were, of course, white; the racial classifications were thus clearly not used to exclude any race but rather to assure that no race was excluded. In short, the racial classifications at issue here are a far cry from those struck down in such cases as *Sweatt* v. *Painter* (1950) 339 U.S. 629 [94 L.Ed. 1114, 70 S.Ct. 848].

[2] It is sometimes suggested that racial classifications that accord "preferential" treatment to minorities stigmatize such minorities, implying that minority individuals cannot "make it" on their own merit. (See *DeFunis* v. *Odegaard* (1974) 416 U.S. 312, 343 [40 L.Ed.2d 164, 184, 94 S.Ct. 1704] (Douglas, J. dissenting).) But this view fails to recognize that the so-called "preference" extended to minorities is in no sense a statement of their inferior ability, but rather a recognition either that an allegedly "objective" measure is actually culturally biased against minorities or that minorities' performance does not connote their true ability, but reflects the continuing disabilities of past discrimination. Indeed, the *failure* of the medical school to take such action might well be stigmatizing, for such inaction could imply that the minorities' current underrepresentation in medical school admissions accurately reflects their lesser abilities.

The view that "preferential" racial classifications are stigmatizing, moreover, overlooks the fact that such classifications are often imposed by courts or by executive order in recognition of the fact that minorities continue to be the victims of racial discrimination which cannot easily be detected or proven. (See cases cited at fns. 5, 6, *post*.) Thus, the establishment of explicit percentage hiring or promotion "goals" for minorities does not suggest minorities cannot make it on their own merit, but instead provides some method for evaluating the actual nondiscriminatory character of an employer's hiring or promotion policies.

The majority, of course, recognize that the racial classifications at issue here are utilized for entirely different purposes than the racial classifications previously held constitutionally suspect. Nevertheless, they hold that the instant racial classifications must be equated with the invidious racial classifications of prior cases and be judged under the same exacting standard applied to such presumptively unconstitutional laws. The majority, however, can cite no decision which supports this conclusion.[3]

In fact, the existing authorities dictate just the opposite result. In recent years numerous decisions of this court, the United States Supreme Court and the lower federal courts have firmly established that the use of racial classifications to promote integration or to remedy the continuing effects of past discrimination is neither presumptively unconstitutional nor suspect, but rather is fully consistent with the precepts of the equal protection clause.

The question of the constitutional legitimacy of utilizing racial classifications to achieve integration first arose in the context of efforts to desegregate public primary and secondary schools. In *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 948-951 [92 Cal.Rptr. 309, 479 P.2d 669], our court spoke directly to this issue, explicitly rejecting the contention that any use of racial classification in pupil assignments was unconstitutional, even for the purpose of integrating schools. We declared: "[I]n a society free of the perdition of past discrimination, the courts might well reject all attempts at racial classification. We seek, however, to provide for practical remedies for present discrimination, and to eradicate the effects of prior segregation; 'at this point, and perhaps for a long time, true nondiscrimination may be attained, paradoxically, only by taking color into consideration.' [Citation.] *We conclude that the racial classification involved in the effective integration of public schools does not deny, but secures, the equal protection of the laws.*" (Italics added.) (3 Cal.3d at p. 951.)

---

[3]The very recent Case of *McDonald* v. *Santa Fe Trail Transportation Co.* (1976) 427 U.S. 273 [49 L.Ed.2d 493, 96 S.Ct. 2574] is no exception. Although in *McDonald* the court did hold that under two federal civil rights statutes discrimination against whites is to be evaluated by the same standards as discrimination against blacks, the court was careful to emphasize that the racial discrimination at issue in that case was unrelated to any affirmative action program, such as is involved in the case at bar. Justice Marshall, writing for the *McDonald* court explained: "Santa Fe disclaims that the actions challenged here were any part of an affirmative action program . . . and we emphasize that we do not consider here the permissibility of such a program, whether judicially required or otherwise prompted." (427 U.S. at p. 281, fn. 8 [49 L.Ed.2d at p. 501].)

This clear holding was reiterated by the United States Supreme Court just a few months after *Johnson*. In *Swann* v. *Board of Education* (1971) 402 U.S. 1 [28 L.Ed.2d 554, 91 S.Ct. 1267], the Supreme Court addressed a school board assertion "that the Constitution requires that teachers be assigned on a 'color blind' basis"; the court's answer was most explicit: "We reject that contention." (*Id.,* at p. 19 [28 L.Ed.2d at p. 568]; see, e.g., *U.S.* v. *Montgomery Bd. of Educ.* (1969) 395 U.S. 225 [23 L.Ed.2d 263, 89 S.Ct. 1670].) The court was equally emphatic in recognizing the constitutionality of utilizing racial classification of students to achieve integration in school assignments. "Just as the race of students must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy. To forbid, at this stage, all assignments made on the basis of race would deprive school authorities of the one tool absolutely essential to fulfillment of their constitutional obligation to eliminate existing dual school systems." (*Board of Education* v. *Swann* (1971) 402 U.S. 43, 46 [28 L.Ed.2d 586, 589, 91 S.Ct. 1284].)

Moreover, dispelling any notion that remedial racial classifications are only permissible to remedy an unconstitutional condition, the *Swann* court expressly approved a school board's voluntary use of racial classifications to promote integration and to achieve racially balanced schools even in the absence of a constitutional obligation to desegregate. The court declared: "School authorities are traditionally charged with broad powers to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. *To do this as an educational policy is within the broad discretionary powers of school authorities*; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court." (Italics added.) (402 U.S. at p. 16 [28 L.Ed.2d at pp. 566-567].)[4]

This passage, of course, has a most direct application to the instant case. Here, the educational authorities *have* concluded that in order to prepare medical students to live and practice in a pluralistic society, the

---

[4] *Swann*'s conclusion in this regard is consistent with the numerous court decisions holding that school authorities have the constitutional authority to utilize racial classification to undo de facto school segregation, even if such de facto segregation is not in itself unconstitutional. (See, e.g., *Offerman* v. *Nitkowski* (2d Cir. 1967) 378 F.2d 22; *Wanner* v. *County School Board of Arlington County, Va.* (4th Cir. 1966) 357 F.2d 452; *Springfield School Committee* v. *Barksdale* (1st Cir. 1965) 348 F.2d 261.)

medical school should have an integrated student body, and they have utilized racial classifications to achieve such integration. *Swann* teaches that such a noninvidious use of racial classifications "is within the broad discretionary powers of school authorities," and refutes the majority's contention that in this context the use of racial classifications is presumptively unconstitutional.

It is not only in the school desegregation realm, moreover, that courts have recognized the necessity and propriety of utilizing racial classifications to promote integration and to overcome the continuing effects of past discriminatory treatment. In the employment area, for example, literally dozens of federal "Title VII" (42 U.S.C. § 2000e et seq.) decisions have confirmed the propriety of using "preferential" minority hiring goals as a remedy when racial or ethnic minorities have been disproportionately excluded from hiring opportunities in the past.[5] And while the remedial racial classifications in most Title VII cases have been embodied in court orders, a separate line of "Executive Order" (Exec. Order 11246, 30 Fed. Reg. 12319 as amended 32 Fed. Reg. 14303; 34 Fed. Reg. 12985) employment decisions, upholding affirmative action plans requiring federal contractors to utilize racial classifications to increase the number of minority employees, attests to the constitutionality of administratively implemented remedial racial classifications.[6]

Finally, one of the United States Supreme Court's most recent employment decisions, *Washington* v. *Davis* (1976) 426 U.S. 229 [48 L.Ed.2d 597, 96 S.Ct. 2040]—decided just this past June—provides additional evidence that the majority is incorrect in asserting that remedial racial classifications are constitutionally suspect. Under the majority's view, any use of racial classifications is presumptively unconstitutional; thus, the majority suggest that the medical school's recruiting efforts, as well as its admission decisions, must be conducted strictly on a

[5]See, e.g., *United States* v. *Wood, Wire and Metal Lath. Int. U., Loc. No. 46* (2d Cir. 1973) 471 F.2d 408, cert. den. 412 U.S. 939 [37 L.Ed.2d 398, 93 S.Ct. 2773]; *United States* v. *Local Union No. 212, etc.* (6th Cir. 1973) 472 F.2d 634; *United States* v. *Ironworkers Local 86* (9th Cir. 1971) 443 F.2d 544, cert. den. 404 U.S. 984 [30 L.Ed.2d 367, 92 S.Ct. 447].

[6]See *Contractors Ass'n of Eastern Pa.* v. *Secretary of Labor* (3d Cir. 1971) 442 F.2d 159, cert. den. 404 U.S. 854 [30 L.Ed.2d 95, 92 S.Ct. 98] (Philadelphia Plan); *Weiner* v. *Cuyahoga Community College District* (1969) 19 Ohio St.2d 35 [48 Ohio Ops.2d 48, 249 N.E.2d 907] (Cleveland Plan); *Joyce* v. *McCrane* (D.N.J. 1970) 320 F.Supp. 1284 (Newark Plan); accord *Southern Illinois Builders Association* v. *Ogilvie* (7th Cir. 1972) 471 F.2d 680 (state affirmative action plan); *Associated Gen. Contractors of Mass., Inc.* v. *Altshuler* (1st Cir. 1973) 490 F.2d 9, cert. den. (1974) 416 U.S. 957 [40 L.Ed.2d 307, 94 S.Ct. 1971] (same).

racially neutral basis. (See p. 55, *ante.*) In the recent *Washington* decision, however, a majority of the United States Supreme Court exhibited no hostility whatever to a trial court finding that the Washington, D.C. police had made special affirmative efforts to recruit black officers. On the contrary, the majority in *Washington specifically relied* upon these "affirmative efforts . . . to recruit black officers" in concluding that no inference could properly be drawn that the police department had improperly discriminated on the basis of race. (426 U.S. at p. 246 [48 L.Ed.2d at p. 611].) The *Washington* court's explicit approval of benign racial classifications cannot be reconciled with the majority's present assertion that all such racially "non-neutral" efforts are presumptively unconstitutional.[7]

The use of benign racial classifications, furthermore, has been upheld in fields other than school desegregation and employment. As the First Circuit recently noted: "Intentional official recognition of race has been found necessary to achieve fair and equal opportunity in the selection of grand juries, Brooks v. Beto, 366 F.2d 1 (5th Cir. 1966); tenants for public housing, Otero v. New York City Housing Authority, 484 F.2d 1122 (2d Cir. 1973) . . . Gautreaux v. Chicago Housing Authority, 304 F.Supp. 736 (N.D.Ill. 1969); [and] school administration, Porcelli v. Titus (3d Cir. 1970) 431 F.2d 1254." (*Associated Gen. Contractors of Mass., Inc. v. Altshuler, supra,* 490 F.2d 9, 16.) Indeed, reviewing the host of recent

---

[7]Another recent employment decision of the United States Supreme Court further refutes the majority's conclusion that remedial racial classifications are constitutionally suspect. In *Morton* v. *Mancari* (1974) 417 U.S. 535 [41 L.Ed.2d 290, 94 S.Ct. 2474], several non-Indian employees of the Bureau of Indian Affairs challenged the validity of a provision of the Indian Reorganization Act of 1934 (25 U.S.C. § 461) which granted an employment preference—in both hiring and promotion—to qualified Indians; the plaintiff employees contended that this preference (1) was inconsistent with and impliedly repealed by the anti-discrimination provisions of the Equal Employment Opportunities Act (42 U.S.C. § 2000e et seq.) which prohibits the federal government from discrimination in employment decisions on the basis of "race, color, religion, sex or national origin" and, (2) if not so repealed, was contrary to the equal protection principles embodied in the Fifth Amendment.

A unanimous Supreme Court rejected both of these contentions and upheld the validity of the employment preference. In dismissing the argument that the preferential treatment of Indians was inconsistent with the provisions of the Equal Employment Opportunities Act, the court observed: "The anti-discrimination provision [of the Equal Employment Opportunities Act], aimed at alleviating minority discrimination in employment, obviously is designed to deal with an entirely different and, indeed, opposite problem. *Any perceived conflict is thus more apparent than real. . . .*" (417 U.S. at p. 550 [41 L.Ed.2d at p. 300].) By parity of reasoning, "any perceived conflict" between the remedial preferential racial classification at issue in this case and the anti-discrimination principles embodied in the equal protection clause of the Fourteenth Amendment "is more apparent than real."

decisions which have approved the use of remedial racial classifications, the First Circuit observed "*It is by now well understood* . . . that our society cannot be completely colorblind in the short term if we are to have a colorblind society in the long term." (Italics added.) (*Id.*)

This understanding has been lost on the majority. Although acknowledging the existence of at least some of the numerous decisions upholding benign racial classifications in diverse contexts, the majority claim that all of the precedents are distinguishable from the instant case either because the past racial classifications did not impose any "detriment" on nonminorities, or because such racial classifications were adopted to remedy specific effects of racial discrimination practiced by the defendant. Neither of these purported distinctions will withstand analysis.

To begin with, it is simply not true that the remedial racial classifications approved by the courts in recent years have not had the effect of placing nonminorities at some disadvantage vis-a-vis benefited minorities. The employment decisions noted above provide perhaps the clearest refutation of the majority's position. Pursuant to both Title VII and Executive Order 11246, employers have been required to assure that some percentage of persons hired in the future are from minority groups; as a consequence, some nonminority applicants who might otherwise have been hired may not obtain employment because the employer is required to hire a number of qualified minority applicants. Although, in the majority's terminology, such remedial programs can thus result in depriving nonminority applicants of a "benefit" that they would have enjoyed "but for their race," federal courts have regularly upheld the constitutionality of such remedial racial classifications and have not equated such measures with invidious racial classifications. (See fns. 5, 6, *ante*.) The special admission program at issue here, of course, is directly analogous to such affirmative action programs.

Moreover, the employment cases are by no means the only instance in which judicially sanctioned benign racial classifications have "deprived" nonminorities of a benefit on the basis of their race. Although the majority maintain that the benign racial classifications employed in school desegregation do not have such an effect, that assertion clearly fails. In the first place, no one can realistically assert that white-Anglo students who have been transferred from schools with better facilities and more experienced teachers to presently "unequal" schools as part of

the desegregation process have not suffered at least some detriment that they would not have suffered "but for" their race. The fact that such children have "no right to a segregated education" (see p. 47, *ante*) does not distinguish past desegregation decisions from the instant case since it is equally true that medical school applicants have no right to a segregated medical education.

The fallacy of the majority's analysis becomes crystal clear upon merely a brief examination of the actual mechanics of the typical desegregation process. As the United States Supreme Court observed in *Swann*, "[a]n optional majority-to-minority transfer provision has long been recognized as a useful part of every desegregation plan." (402 U.S. at pp. 26-27 [28 L.Ed.2d at p. 572].) Under such a transfer provision, minority students assigned to a predominantly minority school are afforded the opportunity to transfer to a better predominantly white-Anglo school in the district; a white-Anglo student who is initially assigned to the same predominantly minority school, however, is denied that transfer option "on the basis of his race." The rationale of this racial classification, of course, is clear and quite legitimate; transfers that will improve school integration are permissible, while those that will lead to greater segregation are not. Nonetheless, under the constitutional approach applied by the majority in the instant case, such a normal tool of desegregation would apparently be unconstitutional. Given this court's very recent unanimous approval of just such a plan (*Crawford* v. *Board of Education* (1976) 17 Cal.3d 280, 308 [130 Cal.Rptr. 724, 551 P.2d 28]), the flaw in the majority's constitutional approach becomes patent.

Another example may further illustrate the similarity of the benign racial classifications utilized in the typical school desegregation process and the racial classifications at issue in this case. One increasingly common tool in the desegregation process is the establishment of a "magnet" school at the site of a predominantly minority school in an attempt to encourage nonminority students voluntarily to transfer to the school. Such "magnet" schools are made attractive by offering curriculum choices or special equipment not available in other schools in the district.

In order for the "magnet" school concept to achieve integration, however, the establishment of the special offerings must invariably be accompanied by some racial guidelines or "quotas" for student enrollment. Thus, for example, if the "magnet" school offers an advanced science or an advanced music curriculum, admission is not provided

solely on the basis of which applicants have the best grades or most potential in science or music; while such criteria may well be taken into account, racial criteria must also be used in order that the basic goal of an integrated school be achieved. Consequently, if applicants of a particular race have higher credentials than applicants of another race, it may be comparatively "easier" for applicants of the latter race to attain admission to the magnet school. Despite the "preference" inherent in such an integration tool, courts have repeatedly upheld the constitutionality of such programs. (See, e.g., *Hart* v. *Community School Bd. of Ed., N.Y.Sch. Dist. #21* (2d Cir. 1975) 512 F.2d 37, 42-43, 54-55.)

The simple reality revealed by these examples is that in many circumstances any remedy for the inequities flowing from past discrimination will inevitably result in some detriment to nonminorities. Whenever there is a limited pool of resources from which minorities have been disproportionately excluded, equalization of opportunity can only be accomplished by a reallocation of such resources; those who have previously enjoyed a disproportionate advantage must give up some of that advantage if those who have historically had less are to be afforded an equitable share. This reality, however, has not led courts to invalidate the remedial use of benign classifications. (See also *Kahn* v. *Shevin* (1974) 416 U.S. 351 [40 L.Ed.2d 189, 94 S.Ct. 1734]; *Morton* v. *Mancari, supra,* 417 U.S. 535.)

The majority are similarly in error in claiming that the instant case can be distinguished from past benign racial classification cases on the ground that prior cases only permit the use of such classifications as a remedy for racial discrimination undertaken in the past.

In the first place, the medical school's special admission program is, in a very real and important sense, intended to overcome the continuing effect of past discrimination in this country. As the United States Supreme Court has acknowledged on numerous occasions, the effect of our nation's sad legacy of racial discrimination runs deep and wide, and is in no sense limited to those schools, or to those states, which practiced de jure segregation. (See, e.g., *Oregon* v. *Mitchell* (1970) 400 U.S. 112, 284 [27 L.Ed.2d 272, 373, 91 S.Ct. 260].) Further, Supreme Court decisions specifically recognize that discrimination endured by minorities in primary and secondary education will frequently result in later disadvantage to such minorities if educationally based tests are used as the primary criterion for conditioning access to a benefit. (See *South*

*Carolina* v. *Katzenbach* (1966) 383 U.S. 301, 327-334 [15 L.Ed.2d 769, 786-790, 86 S.Ct. 803]; *Gaston County* v. *United States* (1969) 395 U.S. 285 [23 L.Ed.2d 309, 89 S.Ct. 1720]; *Griggs* v. *Duke Power Co.* (1971) 401 U.S. 424, 430 [28 L.Ed.2d 158, 163-164, 91 S.Ct. 849].) The medical school took this continuing discriminatory impact into account in concluding that the continuation of its traditional admission policies was unfair to disadvantaged minorities and in deciding to implement the special admission program.

The majority appear to suggest, however, that the medical school was not free to implement benign racial classifications because there is no evidence that the medical school had itself engaged in racial discrimination in the past. Initially, such a requirement is, on its face, completely illogical. The fact that a governmental institution has not itself engaged in discrimination affords no reason for precluding such an institution from taking into account, through remedial classifications, the present effects of past discrimination by other bodies. The rule proffered by the majority, moreover, would "penalize" precisely the wrong institutions. It must be remembered that the medical school here has *voluntarily* decided that it is in its educational interest to maintain an integrated medical school; the effect of the majority's suggestion would be to deny Davis medical school the right to implement such a judgment, and to grant that opportunity only to institutions that have practiced racial discrimination in the past. No one can seriously maintain that such a result is dictated by the Constitution.

The confusion underlying the majority's approach may be traced to statements in several benign racial classification cases indicating that an employer or educational institution may not be judicially *compelled* to adopt remedial racial classifications unless it has engaged in racial discrimination in the past. (See *Swann* v. *Board of Education, supra,* 402 U.S. 1, 16 [28 L.Ed.2d 554, 566-567].) As the Title VII cases teach, however, past "discrimination" that will constitutionally justify a remedial court order utilizing benign racial classifications need not amount to unconstitutional conduct, as the majority intimate, but may instead simply represent an objective condition of minority underrepresentation that is not satisfactorily justified by an employer. (See *Washington* v. *Davis* (1976) 426 U.S. 229 [48 L.Ed.2d 597, 96 S.Ct. 2040].) The majority do not explain why, if Congress can constitutionally mandate the use of remedial racial classifications to overcome such statutorily defined discrimination, the medical school cannot use such classifications to

overcome a comparable condition of substantial minority underrepresentation.[8]

Moreover, in the "Executive Order" cases upholding federally compelled "affirmative action" employment programs for government contractors, courts have sanctioned the coercive implementation of benign racial classification schemes in the absence of any showing that a particular employer had engaged in racial discrimination in the past. (See *Contractors Association of Eastern Pa.* v. *Secretary of Labor, supra,* 442 F.2d 159, 176 and other cases cited at fn. 6, *ante.*) In light of these numerous authorities, the majority is simply incorrect in asserting that "[a]bsent a finding of past discrimination, . . . the federal courts, with one exception, have held that the preferential treatment of minorities in employment is invalid on the ground that it deprives a member of the majority of a benefit because of his race." (See p. 57, *ante.*)[9]

---

[8]The majority's position similarly cannot be justified by a claim that remedial racial classifications are justified only to benefit the particular victims of past discrimination, or to disadvantage those particular nonminorities who have received the illicit advantage of past discrimination. The remedial "racial ratio" plans approved in the numerous Title VII cases noted above did not confine benefits to victims of past discrimination, but provided for broad relief to all members of a minority group that had been excluded from employment in the past. Similarly, the United States Supreme Court has recently made clear that no constitutional infirmity inheres in a Title VII remedial order by virtue of the fact that the order may incidentally detrimentally affect "innocent" nonminority employees. (See *Franks* v. *Bowman Transportation Corp., Inc.* (1976) 424 U.S. 770, 779 [47 L.Ed. 444, 96 S.Ct. 1251].

[9]Although the majority cite five cases to support their contention that the federal courts have not permitted "preferential" benign classifications absent a finding of past discrimination, only two district court cases—one of which is not even published—are at all on point. In *Anderson* v. *San Francisco Unified School District* (N.D. Cal. 1972) 357 F.Supp. 248, 250, the court did hold that defendant school district could not utilize benign racial classifications to provide a more integrated administrative staff; the opinion does not cite a single authority, and thus neither discusses nor attempts to distinguish the numerous federal cases approving such benign classifications. *Brunetti* v. *City of Berkeley* (N.D. Cal. 1975) No. C-74-0051 RFP, the unpublished district court decision, while citing many relevant authorities, fails to discuss the distinction between a governmental entity's authority voluntarily to utilize racial classification to remedy an existing imbalance and a court's power to compel such use of racial classifications.

The three remaining decisions relied upon by the majority (*Chance* v. *Board of Examiners* (2d Cir. 1976) 534 F.2d 993; *Kirkland* v. *New York St. Dept. of Correctional Serv.* (2d Cir. 1975) 520 F.2d 420; *Weber* v. *Kaiser Aluminum and Chemical Corp.* (E.D.L. 1976) 415 F.Supp. 761), all Title VII cases, are not relevant to the question at issue here. *Chance* and *Kirkland* merely hold that on the showing made in those cases, the trial court should not have entered a remedial order requiring the establishment of preferential racial classifications; those cases do not address the propriety of the voluntary use of remedial racial classifications under circumstances similar to the instant case. *Weber,* while invalidating a voluntarily adopted preferential scheme under the provisions of Title VII, does not suggest that such a remedial procedure is unconstitutional but, on the

In any event, however, limitations on the government's authority *to compel* the use of benign racial classification are entirely beside the point. Our question here is *not* whether the Davis medical school can constitutionally be compelled to establish benign racial classifications to remedy the exclusionary result of its past admission policies, but rather whether the Constitution forbids the medical school from taking such remedial action on its own. As noted, the United States Supreme Court has made it quite clear that a school authority's power voluntarily to adopt benign racial classifications is in no way dependent upon its having engaged in unconstitutional conduct in the past. To reiterate, in *Swann* the court stated in this regard: "To do this [utilize racial classifications to achieve racially balanced schools] as an educational policy is within the broad discretionary power of school authorities; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court." (402 U.S. at p. 16 [28 L.Ed.2d at pp. 566-567]; see, e.g., *Porcelli* v. *Titus* (3d Cir. 1970) 431 F.2d 1254; *Pellicer* v. *Brotherhood of Ry. and S.S. Clerks, etc.* (5th Cir. 1954) 217 F.2d 205, affg. (S.D.Fla. 1953) 118 F.Supp. 254.)

In sum, the governing authorities draw a clear distinction between invidious racial classifications and remedial, benign racial classifications. The majority eschew such a distinction, suggesting that there is no principled basis for distinguishing between laws which utilize racial classifications to stigmatize or accord inferior treatment to minorities and laws which utilize such classifications to overcome the effects of past discrimination or to promote integration but which have the incidental effect of disadvantaging those of the majority race. There are, however, several principled grounds for drawing just the distinction that the cases have in fact drawn.

First, such a distinction is justified by the history and central purpose of the Fourteenth Amendment itself. It is well recognized, of course, that the primary purpose of the amendment was to preclude individual states from according discriminatory treatment to blacks; indeed, at first, the Supreme Court held that this special protection for blacks was the *only* purpose of the equal protection clause. (See *Slaughterhouse Cases, supra,* 83 U.S. (16 Wall.) 36, 81 [21 L.Ed. 394, 411].) Gradually, however, and most properly, the court acknowledged that in light of the general wording of the equal protection clause, the court should interpret the

contrary, indicates that Congress possesses the constitutional authority to authorize such a benign use of racial classifications absent past discrimination. (415 F.Supp. at p. 763.)

amendment as affording special protection to other victimized minorities in positions analogous to that of blacks. (See, e.g., *Yick Wo* v. *Hopkins, supra,* 118 U.S. 356, 373-378 [30 L.Ed. 220, 227-229]; *Oyama* v. *California* (1948) 332 U.S. 633, 644-646 [92 L.Ed. 249, 258-259, 68 S.Ct. 269]; *Hernandez* v. *Texas* (1954) 347 U.S. 475 [98 L.Ed. 866, 74 S.Ct. 667]; *Graham* v. *Richardson* (1971) 403 U.S. 365, 372 [29 L.Ed.2d 534, 541-542, 91 S.Ct. 1848].) In each of the cases in which differential treatment was deemed presumptively unconstitutional, however, the minority group had suffered inferior—not favored—treatment. Nothing in the history of the Fourteenth Amendment suggests that the provision was intended to preclude the federal government or the states from especially attempting to meet the peculiar needs of minority groups, even when such efforts could be construed as according minorities some measure of preferential treatment. (Cf. *Kahn* v. *Shevin, supra,* 416 U.S. 351; *Lau* v. *Nichols* (1974) 414 U.S. 563 [39 L.Ed.2d 1, 94 S.Ct. 786]; *Katzenbach* v. *Morgan* (1966) 384 U.S. 641 [16 L.Ed.2d 828, 86 S.Ct. 1717].)

Second, in addition to the history and purpose of the Fourteenth Amendment, constitutional decisions explicating the appropriate scope of judicial review provide a sound basis for the differential judicial treatment of invidious and benign racial classifications. Beginning with Justice Stone's celebrated "footnote 4" in *U.S.* v. *Carolene Products Co.* (1938) 304 U.S. 144 [82 L.Ed. 1234, 58 S.Ct. 778], the Supreme Court has recognized that whereas in most areas courts properly entertain a presumption that governmental action is constitutional, "prejudice *against* discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of the political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry." (Italics added.) (304 U.S. at pp. 152-153, fn. 4 [82 L.Ed. at p. 1242].)

Heightened judicial scrutiny is accordingly appropriate when review-ing laws embodying invidious racial classifications, because the political process affords an inadequate check on discrimination *against* "discrete and insular minorities." (See, e.g., *Graham* v. *Richardson, supra,* 403 U.S. 365, 372 [29 L.Ed.2d 534, 541-542]; *Frontiero* v. *Richardson* (1973) 411 U.S. 677, 685-686 [36 L.Ed.2d 583, 590-591, 93 S.Ct. 1764]; *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 18-20 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]; cf. *Massachussets Board of Retirement* v. *Murgia* (1976) 427 U.S. 307 [49 L.Ed.2d 520, 96 S.Ct. 2562]; *San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1, 28 [36 L.Ed.2d 16, 39-40, 93 S.Ct. 1278].) By the same token, however, such stringent judicial review is not appro-

priate when, as here, racial classifications are utilized remedially *to benefit* such minorities, for under such circumstances the normal political process can be relied on to protect the majority who may be incidentally injured by the classification scheme.[10]

Concluding this discussion, we point out that the majority's treatment of the medical school's special admission program as constitutionally "suspect" is not supported by (1) existing case law, (2) the history and purpose of the Fourteenth Amendment or (3) the jurisprudential rationale justifying strict judicial review. The special admission program under review here does not presumptively conflict with the constitutional protection afforded by the equal protection clause.

2. *The racial classifications embodied in the special admission program relate directly, and in a reasonable fashion, to the compelling state interest in promoting integration and are thus constitutional.*

As discussed above, the remedial racial classifications at issue here cannot properly be viewed as presumptively unconstitutional and thus should not be tested against the standard applied to invidious racial classifications, the exacting, "seemingly insurmountable" strict scrutiny standard. (*Dunn* v. *Blumstein* (1972) 405 U.S. 330, 363 [31 L.Ed.2d 274, 296, 92 S.Ct. 995] (Burger, C. J. dissenting).) Although the strict scrutiny standard is not applicable, the appropriate constitutional standard to be employed in testing the constitutionality of benign racial classifications has not been clearly set forth. A number of relevant decisions of the United States Supreme Court suggest that the traditional "rational basis" equal protection test—which affords governmental bodies broad discretion in fashioning remedial policies—may well be the appropriate standard. (See *Katzenbach* v. *Morgan, supra,* 384 U.S. 641, 651, 657-658 [16 L.Ed.2d 828, 835-836, 839-840]; *Swann* v. *Board of Education, supra,* 402 U.S. 1, 16 [28 L.Ed.2d 554, 566-567]; *Kahn* v. *Shevin, supra,* 416 U.S.

---

[10]It is sometimes claimed that such reasoning ignores the fact that the white majority is not a homogeneous group and that preferential treatment of minorities may in fact be utilized as a means of discriminating against a small subclass of the majority group. (See p. 50, fn. 16, *ante.*) If such discrimination against a subgroup is indeed present, I would agree that the classification scheme could not properly be characterized as "benign" and presumptively constitutional. There is, however, absolutely no indication in the instant record that the special admission program at Davis was instituted to discriminate against a particular subclass of nonminorities, nor is there any claim that the program had in fact such a differential impact. Under these circumstances, there is no justification for treating the remedial racial classification embodied in the special admissions program as equivalent to invidious racial classification, and no reason to declare the program presumptively unconstitutional.

351, 355-356 [40 L.Ed.2d 189, 193]; *Morton* v. *Mancari, supra,* 417 U.S. 535, 554-555 [41 L.Ed.2d 290, 302-303].) Quite recently, however, several state and lower federal courts have suggested that in light of the potential "untoward consequences" of racial classifications of any kind—benign as well as invidious—a somewhat more rigorous judicial scrutiny than is traditionally applied under the "rational basis" test should be employed. (See *Alevy* v. *Downstate Medical Center* (1976) 39 N.Y.2d 326 [384 N.Y.S.2d 82, 88-91, 348 N.E.2d 537, 543-546]; *Associated Gen. Contractors of Mass., Inc.* v. *Altshuler, supra,* 490 F.2d 9, 17.)

There are sound reasons for the judiciary to take a somewhat cautious approach in reviewing ostensibly benign racial classifications. In light of the historical misuse of racial classifications in this country, it is important that courts carefully and realistically assess the purpose and effect of any racial classification to assure that the classification is actually devised for legitimate remedial purposes rather than as a covert method for imposing invidious racial discrimination. In undertaking such a realistic review, however, a court must also be mindful that remedies for the continuing effects of past discrimination have proven distressingly elusive, and that it is therefore important that entities attempting in good faith to promote integration be given reasonable leeway in experimenting with various methods to achieve this compelling societal objective. Accordingly, once a court is convinced that differential racial treatment has been adopted in a good faith attempt to promote integration, it should uphold a benign racial classification so long as it is directly and reasonably related to the attainment of integration. Under this standard, the racial classifications at issue here are clearly constitutional.

The background of the Davis special admission program demonstrates that its racial classifications were clearly devised as a realistic attempt to promote integration. Prior to the implementation of the special admission program, the medical school had pursued an admission process which relied heavily on an applicant's scores on the standardized Medical College Aptitude Test (MCAT) and on an applicant's undergraduate grade point average. The use of such traditional admission criteria resulted in the rejection of almost all qualified minority applicants. Thus, although the medical school regularly received applications from a vast number of qualified applicants of all races and ethnic backgrounds, as a consequence of its prior admission policies the medical school functioned, in effect, as a largely segregated educational institution.

To remedy this segregated condition the medical school implemented the special admission program. The program has several aspects. First, whereas the medical school, for administrative purposes, had established a 2.5 undergraduate grade point average as a somewhat arbitrary "cut-off" point in its normal admission decisions, the special admission program eliminated this automatic cut-off point for disadvantaged minorities on the ground that in light of such applicants' peculiar circumstances—a different cultural background combined with economic needs that often required such applicants to hold jobs during their undergraduate years—grade point averages were quite frequently not a reliable indicator of these applicants' potential for success in the medical profession. (See Simon, *Performance of Medical Students Admitted Via Regular and Admission-Variance Routes* (1975) 50 J.Med.Ed. 237.) Second, by adopting a specific goal of students to be accepted under the special admission program—approximately one-sixth of the student body—the medical school made a policy judgment that the benefits of integration required the acceptance of more than a token number of minority students.

It must be emphasized, however, that the special admission program did not contemplate, nor sanction, the admission of *unqualified* applicants simply because they were minorities. As reflected in the majority opinion, the medical school did not by any means accept all minority students who applied for admission; in 1973, the school *granted interviews* to only one-third of the special admission applicants, and in 1974, only one-sixth of such applicants were interviewed. Moreover, no minority applicant was admitted into the medical school without being found fully qualified for medical school study by the *same* admissions committee that passed on all other applicants.

The majority claim that in accepting some minority applicants with grade point averages, test scores or "benchmark" scores that would have resulted in rejection if such applicants had been white, the medical school has accepted "less qualified" minorities over "more qualified" nonminorities, and therefore that the program is discriminatory and unreasonable.[11] The majority err, however, in maintaining that an

[11]Although the majority suggest that the "benchmark" scores assigned by the admissions committee to each applicant reflected the medical school's overall evaluation of the applicant's qualifications (see p. 47, *ante*), this conclusion overlooks the fact that the assignment of benchmark scores was only *one* element of the admissions procedure. The significance of the "benchmark" scores cannot properly be judged in isolation, for the medical school specifically utilized such benchmarks only in conjunction with, and complementary to, its separate special admissions program. By so structuring its

applicant's race or ethnic background is never relevant to his qualification for medical school. As the medical school points out, there are a number of reasons that an applicant's membership in a minority race or ethnic group was properly taken into consideration in evaluating his relative qualification for medical school and his potential for making a contribution to the medical profession.

First, as the chairman of the school's admission committee explained, disadvantaged minorities were accorded differential treatment in part because the school concluded that the "objective" academic credentials on which the school had largely relied in the past did not accurately predict such minority applicant's qualifications and did not provide an equitable basis for comparison with other applicants.[12] To the extent that the differential treatment of minority applicants was thus based on the school's determination that its traditional criteria were "culturally biased" against minorities, it seems incontrovertible that the school, at the very least, was entitled voluntarily to adjust its standards to overcome any built-in bias. (Cf. *Griggs* v. *Duke Power Co., supra,* 401 U.S. 424.)

Indeed, the medical school's decision to deemphasize MCAT scores and grade point averages for minorities is especially reasonable and

admissions program, the medical school demonstrated its determination that disadvantaged minority status is itself a relevant qualification in determining an applicant's potential for contributing to the medical school and the medical profession. The medical school's admission decisions testify that the benchmark scores assigned to regular and special admission applicants were not intended as comparative measures of overall qualification for medical school. Thus the fact that some special admission applicants were admitted with lower "benchmark" scores than nonminorities does not mean that such applicants were either "less qualified" or "unqualified" for medical practice, under the medical school's own standards. Indeed, even among regular admission applicants benchmark scores were not determinative of admission decisions, for the record demonstrates that the medical school regularly made exceptions to benchmark rankings to serve other policies, such as accommodating the spouses of previously admitted applicants.

Although the majority claim that I have assumed the very point in issue by suggesting that race or ethnic background may be one relevant factor in determining an applicant's qualifications for medical school, (see p. 47, *ante*), the majority overlook the crucial fact that it was *the medical school* itself—and not this dissent—that determined that minority race or ethnic background is relevant to an applicant's qualification for medical school. Thus, the majority cannot properly state, as they do, that applicants admitted under the special admission program are less qualified than rejected white applicants *under the medical school's own standards.* (See p. 48, *ante.*)

[12] A number of scholarly articles in the medical field have pointed up the cultural bias implicit in the traditional academic admission criteria. (See e.g., Marshall, *Minority Students for Medicine and the Hazards of High School* (1973) 48 J.Med.Ed. 134; Whittico, *The Medical School Dilemma* (1969) 61 J. Nat. Med. A. 185; Nelson, *Expanding Education Opportunities in Medicine for Black and Other Minority Students* (1970) 45 J.Med.Ed. 731.)

invulnerable to constitutional challenge in light of numerous empirical studies which reveal that, among qualified applicants, such academic credentials bear no significant correlation to an individual's eventual achievement in the medical profession.[13] The findings of these studies are not surprising when one considers all of the nonacademic qualities—energy, compassion, empathy, dedication, dexterity, and the like—which make for a "successful" physician. As medical school admissions officials themselves acknowledge, these studies raise questions of the most serious order as to the propriety of the continuing use of traditional admission criteria.[14]

While such empirical data might well have justified a revamping of the school's admission policies for all applicants, the medical school cannot be said to have acted unreasonably or unconstitutionally in deciding, perhaps as a first step,[15] to decrease its reliance on the traditional criteria

[13]See, e.g., Rhoades, *Motivation, Medical School Admissions and Student Performance* (1974) 49 J.Med.Ed. 1119, 1125; Turner, *Predictors of Clinical Performance* (1974) 49 J.Med.Ed. 338; Haley & Lerner, *The Characteristics and Performance of Medical Students During Preclinical Training* (1972) 47 J.Med.Ed. 446; Gough, *Evaluation of Performance in Medical Training* (1964) 39 J.Med.Ed. 679. See generally, Hoyt, The Relationship Between College Grades and Adult Achievement (1963) page 30.

[14]In one early study, Dr. Price found that with respect to four separate categories of physicians—(1) medical school faculty members, (2) board-certified specialists, (3) urban general practitioners, and (4) rural general practitioners—there was absolutely no correlation between academic performance, as measured by undergraduate and medical school grade point average, and physician performance. Commenting on these findings, Dr. Price stated: "This is a somewhat shocking finding for a medical educator like myself who has spent his professional life selecting applicants for admission to medical school, and in teaching and grading students after admission. It is true that strong suspicion that grades have been weighted much too heavily in predicting performance in medical school and after graduation from medical school is what led to the initiation of this whole study in the first instance; but to have that suspicion so forcefully corroborated has led me to question the adequacy of some of our traditional admission policies, as well as the reliability of conventional grades as a measure of progress of the student during his medical course, or as the sole criterion for promotion, or as a dependable predictor of future success in practice." (Price, *Measurement of Physician Performance* (1964) 39 J.Med.Ed. 203, 209.)

[15]An amicus brief submitted by the Association of American Medical Colleges reports that substantial general changes in medical school admission procedures may well be imminent. "Recognizing the current need for better assessment of academic and personal qualifications, the Association will begin use in 1977 of a revised set of admissions tests as part of a new admissions assessment program. Such tests will not only measure achievement in particular areas of knowledge pertinent to medical study, but will also demonstrate abilities in interpretation of written communications and in problem-solving skills. The development of instruments for evaluating personal qualities deemed necessary for the successful practice of medicine is underway. Seven broad areas have been identified for study: compassion, interprofessional relations, coping capability, sensitivity in interpersonal relations, decision-making capacity, staying power, and realistic self-appraisal." (Pp. 9-10.)

with respect to applications from disadvantaged minorities, who as a group had been so disproportionately excluded by such criteria. As the United States Supreme Court has explained in upholding a benign racial classification in an analogous context: "[I]n deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familiar principles that a 'statute is not invalid under the Constitution because it might have gone farther than it did' [citation], that a legislature need not 'strike at all evils at the same time' [citations], and that 'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind' [citation]." (*Katzenbach* v. *Morgan, supra,* 384 U.S. 641, 657 [16 L.Ed.2d 828, 839].)

Moreover, as the medical school asserts, the minority background of an applicant is relevant to his qualification for medical school and medical practice for reasons beyond the correction of culturally biased academic credentials. As we have already seen, in *Swann* v. *Board of Education, supra,* 402 U.S. 1, 16 [28 L.Ed.2d 554, 566-567], the Supreme Court explicitly confirmed that school authorities are constitutionally empowered to utilize benign racial classifications to achieve racially balanced schools "in order to prepare students to live in a pluralistic society." The special admission process at issue here, of course, was in fact implemented for just such an educational purpose, to provide a diverse, integrated student body in which *all* medical students might learn to interact with and appreciate the problems of all races so as to adequately prepare them for medical practice in a pluralistic society. This educational interest in a diverse student body is no mere "make-weight"; undergraduate schools and professional institutions of the highest calibre have long recognized that the quality of one's educational experience is "affected as importantly by a wide variety of interests, talents, backgrounds and career goals [in the student body] as it is by a fine faculty and . . . libraries [and] laboratories. . . ." (65 Official Register of Harv. U. No. 25 (1968), pp. 104-105.) Thus, given the race and ethnic background of the great majority of students admitted by the medical school, minority applicants possess a distinct qualification for medical school simply by virtue of their ability to enhance the diversity of the student body.

In addition to promoting diversity in the medical school itself, the special admission program was aimed at alleviating the largely segregated nature of the medical profession generally. There is no question but that during the years in question here minorities were grossly underrepresented in the medical profession. (See Thompson, *Curbing the Black*

*Physician Manpower Shortage* (1974) 49 J.Med.Ed. 944.) Realizing that a segregated medical profession might well remain largely oblivious to the realities of life of disadvantaged minorities and the nature and scope of their medical problems, the medical school established the special admission program in part in recognition of its obligation to meet the broad needs of the medical profession at large.

One of the most pressing medical problems in the country, of course, is the paucity of medical services available to residents in poor minority neighborhoods. The medical school tailored its special admission program specifically to meet this problem; all of the minority students accepted under the program came from a disadvantaged background and all expressed their intent to return to practice in poor, minority communities upon completion of their medical training.

The majority, at one point, suggest that this purpose of the special admission program is somehow improper, and that the medical school has, by its approach, committed itself to the illegitimate task of producing, for example, "black [doctors] for blacks." This simplistic characterization of the special admission process surely does a grave disservice to the medical school. The medical school has by no means undertaken to train black doctors simply to treat blacks, or to train chicano doctors simply to treat chicanos; a minority doctor's medical degree is not, of course, a license only to treat minorities. In my view, however, it was neither unreasonable nor improper for the medical school to conclude that at least one of the reasons for the deplorable lack of effective medical services in minority communities is the shortage of minority physicians, and to determine that an increase of disadvantaged minority doctors might play at least some role in improving the situation. (See Karst & Horowitz, *Affirmative Action & Equal Protection* (1974) 60 Va.L.Rev. 955, 970.)

Indeed, the majority itself recognizes the logic of such an approach with respect to the preference accorded by the medical school to applicants from Northern California. As the majority acknowledge, in the years under consideration here the Davis medical school accorded preferential consideration to applicants from Northern California because of the shortage of doctors in that part of the state; the assumption behind that policy, of course, was that such residents were likely to return to the vicinity of their homes when they began their practice. The majority do not question the propriety or reasonableness of

such assumption, and do not invalidate such preferential treatment, although this aspect of the admission procedure, as well as the special admission program, may have hurt plaintiff's chances for admission. Nor do the majority inquire—as they do with the special admission program—whether the shortage of doctors in Northern California could be remedied by alternative means, for example, a government subsidy to all doctors who choose to practice in that area. Since the medical school's interest in increasing medical services in disadvantaged minority communities is surely no less valid than its interest in overcoming the shortage of doctors in rural, less populated areas, I do not see how we can uphold the preferential admission of rural applicants, but strike down such preference to applicants from urban minority communities.

Finally, over and above the benefits accorded to the medical school and to the medical profession, the special admission program was implemented to serve the larger national interest of promoting an integrated society in which persons of all races are represented in all walks of life and at all income levels. As Professor O'Neill has explained: "For minority youth, . . . professionals from and within their community offer essential role models. Success and expanding opportunities suggest that there are ways of 'making it' without resort to violence. Conversely, the denial or closing off of opportunities for education cannot help but breed frustration, resentment and anger at the predominantly white Anglo society." (O'Neill, *Racial Preference and Higher Education: The Larger Context* (1974) 60 Va.L.Rev. 925, 944.) If any state interest can be said to be "compelling" for purposes of the Fourteenth Amendment, it is just such an interest in overcoming the isolation of minorities and bringing them into the mainstream of American society.

Any one of the numerous objectives served by the special admission program would appear sufficient, in itself, to justify the program's existence; surely, when viewed cumulatively, they remove any doubt as to the propriety of the medical school's consideration of race as one relevant factor in the admission decision.

The majority maintain, however, that although the objectives served by the special admission program may be compelling, the medical school could not properly take race into account in achieving such goals. This suggestion simply ignores the nature of these objectives. First, to the extent that standardized test scores and undergraduate grades are particularly poor measures of the potential of minority applicants, any classification which attempts to correct such inequity must inevitably

focus on minority status. Second, because all of the additional objectives of the program—a diverse student body, a desegregated profession, an integrated society—necessitate the effective racial and ethnic integration of the student body, consideration of the race and ethnic background of individual applicants cannot be avoided. As the school desegregation cases teach, as a practical matter "race [must] be considered in formulating a remedy" for segregated institutions. (*Board of Education* v. *Swann, supra,* 402 U.S. 43, 46 [28 L.Ed.2d 586, 589].)

It may be argued that while the medical school could appropriately consider race in the admission process, the special admission program at issue here went too far in setting up a fixed "quota" of 16 places in each medical school class. There is no question that if the 16 places represented a predetermined limit on the number of disadvantaged minorities that would be accepted regardless of how they compared with other applicants, the "quota" would pose very grave, probably fatal, constitutional questions. The plaintiff here, however, does not raise any such objection and, if the program actually operates in such fashion, we must await an appropriate constitutional challenge to this aspect of the admission procedure.

If instead of constituting a limit on disadvantaged minority enrollment, the 16 places "reserved" for the special admission program simply represented the university's determination that a more than token representation of disadvantaged minorities was needed to achieve the numerous benefits of integration, the specific numerical goal becomes more defensible. Although one may question the medical school's decision to establish a designated figure as a matter of policy, past benign racial classification cases suggest that no constitutional infirmity attaches to the establishment of explicit concrete integration goals. (See, e.g., *Swann* v. *Board of Education, supra,* 402 U.S. 1, 16 [28 L.Ed.2d 554, 566-567]; *U.S.* v. *Montgomery Bd. of Educ., supra,* 395 U.S. 225, 235-236 [23 L.Ed.2d 263, 272-273, 89 S.Ct. 1670]; *Southern Illinois Builders Association* v. *Ogilvie, supra,* 471 F.2d 680, 686.)

In light of California's sizable minority population[16] and the current underrepresentation of minorities in the medical profession, the allocation of 16 out of 100 places to the special admission program can hardly be criticized as unreasonably generous. Moreover, only fully qualified applicants were admitted under the program and thus if there had not

---

[16]According to recent figures of the California Department of Finance, minorities comprise more than 25 percent of the state's population.

been a sufficient number of qualified disadvantaged minority applicants the medical school would not have accepted minority applicants simply to fill a quota. (Cf. *Associated Gen. Contractors of Mass., Inc.* v. *Altshuler, supra,* 490 F.2d 9, 18-19.) In this respect, the 16 places represented a "goal" rather than a "quota."[17]

In striking down the special admission program, the majority rely heavily on the medical school's asserted failure to prove that it could not have accomplished its objectives by "less onerous" nonracial alternatives. Since benign classifications are not presumptively unconstitutional, however, the majority err in placing upon the medical school the burden of proving the nonexistence of such alternatives. If alternative remedies are relevant to the constitutionality of the program at all, the party attacking the validity of the program should bear the burden of demonstrating the realistic availability of alternative methods of achieving the medical school's numerous objectives. Plaintiff completely failed to make any such showing in this case.

Moreover, although the majority conclude that the medical school failed to demonstrate the unavailability of alternatives, the only evidence in the present record on this point is the admission committee chairman's statement that, "in the judgment of the faculty of the Davis Medical School, *the special admissions program is the only method* whereby the school can produce a diverse student body which will include qualified students from disadvantaged backgrounds. . . . [T]here would be few, if any, black students and few Mexican-American, Indian or Orientals from disadvantaged backgrounds in the Davis Medical School or any other medical school, if the special admissions program and similar programs at other schools did not exist. . . ." (Italics added.) The majority simply reject this unimpeached statement out-of-hand, and, without any support from the record, suggest a number of alternatives which on their face are either disingenuous or impractical or both.

The majority initially suggest that the medical school could achieve its goals by utilizing such nonracial means as opening its special admission program to disadvantaged applicants of all races. This alternative—like most of the other nonracial classifications which have been suggested— bears the initial vice of disingenuousness. Because the principal objective

---

[17]Professor O'Neill has written: "The distinction between a goal and a quota can be simply stated. . . . [A] goal simply declares an objective which will be met only if a sufficient number of qualified applicants apply, while a quota specifies the number to be admitted from a given group regardless of the pool of qualified applicants." (O'Neill, Discriminating Against Discrimination (1975) p. 68.)

of the medical school is to achieve a *racially* and *ethnically* integrated, rather than an economically diverse, student body, any nonracial classification will achieve the medical school's objective only to the extent that such nonracial classification in fact correlates with minority race and ethnic background. Thus, the process of selecting a racially neutral criterion to promote integration cannot honestly be described as a "nonracial" decision. Yet the majority commands just such a manipulation of labels, so that the perfectly proper purposes of the program must be concealed by subterfuge. I do not concur in this retreat into obfuscating terminology.

Moreover, although the majority speculate that the broadening of the special admission program to disadvantaged applicants of all races will result in approximately the same amount of integration as the present program, that conclusion appears untenable on its face. Because all disadvantaged students need financial aid, the total number of such students a medical school can afford to admit is limited. As a consequence, inclusion of all disadvantaged students in the special admission program would inevitably decrease the number of minority students admitted under the program and thus curtail the achievement of all integration-related objectives. (See, e.g., Sandalow, *Racial Preferences in Higher Education: Political Responsibility and the Judicial Rule* (1975) 42 U.Chi.L.Rev. 653, 690-692.)

The majority's alternative suggestion that the integration of medical schools can be accomplished by increasing the size and number of medical schools is similarly unrealistic. The cost of medical educational facilities is enormous; absolutely nothing suggests that the necessary financial commitment for increased facilities will be forthcoming in the foreseeable future. It is a cruel hoax to deny minorities participation in the medical profession on the basis of such clearly fanciful speculation.

In the end, the majority ultimately defend their holding on the ground that, while there are many laudable objectives served by the special admission program, "there are more forceful *policy reasons* against preferential admissions based on race." (Italics added.) (See p. 61, *ante.*) I do not doubt that both sides of the present controversy can urge strong policy considerations for their positions. (See generally Cox, The Role of the Supreme Court in American Government (1976) pp. 61-68.) Some commentators, like the majority, contend that the adverse effects of any racial classification outweigh any potential benefits (see, e.g., Lavinsky, *DeFunis* v. *Odegaard: The "Non Decision" with a Message* (1975) 75

Colum.L.Rev. 520; Posner, *The DeFunis Case and the Constitutionality of Preferential Treatment of Racial Minorities* 1974 Sup.Ct.Rev. 1); at least as many other scholars, however, maintain that the failure to adopt benign classifications as a temporary measure will perpetuate racial and ethnic deprivation for the indefinite future and will preclude ever achieving a colorblind society. (See, e.g., O'Neill, Discriminating Against Discrimination (1975); Karst & Horowitz, *Affirmative Action and Equal Protection* (1974) 60 Va.L.Rev. 955.) Similarly, while some commentators argue that racial classifications inevitably have a negative educational impact (see, e.g., Kaplan, *Equal Justice in an Unequal World: Equality for the Negro—The Problem of Special Treatment* (1966) 61 Nev.U.L. Rev. 363, 379-380), others have suggested just the contrary. (See Ely, *The Constitutionality of Reverse Racial Discrimination* (1974) 41 U.Chi.L. Rev. 723; Note, *Developments in the Law—Equal Protection* (1969) 82 Harv.L.Rev. 1065, 1113.) In light of these conflicting judgments, it is understandable that the majority might conclude, *as a matter of policy,* that it is preferable to avoid any use of racial classification.

The majority are in serious error, however, in equating their own view of appropriate policy with constitutional commands. In this realm, it is the educational authorities, not the courts, that are empowered to render policy judgments. The very difference of opinion among fairminded and responsible educators and scholars suggests that policy decisions in this area should be left to the discretion of individual educational institutions. As we have seen, nothing in either the purpose of the Fourteenth Amendment, or in the governing authorities, requires the invalidation of the present special admission program.

Two centuries of slavery and racial discrimination have left our nation an awful legacy, a largely separated society in which wealth, educational resources, employment opportunities—indeed all of society's benefits—remain largely the preserve of the white-Anglo majority. Until recently, most attempts to overcome the effects of this heritage of racial discrimination have proven unavailing. In the past decade, however, the implementation of numerous "affirmative action" programs, much like the program challenged in this case, have resulted in at least some degree of integration in many of our institutions.

To date, this court has always been at the forefront in protecting the rights of minorities to participate fully in integrated governmental institutions. (See *Jackson* v. *Pasadena City School Dist.* (1963) 59 Cal.2d 876 [31 Cal.Rptr. 606, 382 P.2d 878]; *Crawford* v. *Board of Education,*

*supra,* 17 Cal.3d 280.) It is anomalous that the Fourteenth Amendment that served as the basis for the requirement that elementary and secondary schools could be *compelled* to integrate, should now be turned around to *forbid* graduate schools from voluntarily seeking that very objective.

I cannot join with the majority in concluding that the Constitution precludes the state through the medical school of the University of California at Davis from pursuing of, its own volition a program to provide for the effective integration of its student body.

The petition of the defendant and appellant for a rehearing was denied October 28, 1976, and the opinion was modified to read as printed above. Tobriner, J., was of the opinion that the petition should be granted.